## STATE v. CARROLL

(No. 2000; June 8, 1937; 69 Pac. (2d) 542)

(Rehearing denied July 20, 1937, without opinion)

30

32

For the appellant, there was a brief and an oral argument by *Carleton A. Lathrop* of Cheyenne.

For the respondent, there was a brief by *Ray E. Lee,*

Attorney General; *T. F. Shea,* Deputy Attorney General; and *Wm. C. Snow,* Assistant Attorney General, all of Cheyenne, and oral argument by *Mr. Shea.*

BLUME, Chief Justice.

Paul H. Carroll, herein called the accused or the defendant, was convicted of murder in the first degree without recommendation and was sentenced to die, on account of killing one C. C. Barnard on October 27, 1935. The defendant pleaded not guilty. He contends that he was insane at the time of the homicide. He has appealed to this court. We shall attempt to give a somewhat connected story of the salient facts shown by

the record, leaving some of the facts, however, to be stated and considered in connection with the discussion of the respective assignments of error.

The defendant was born in Louisiana on November 28, 1899. His mother was a nervous woman, her nervousness increasing as she grew older. Defendant's grandmother became insane and was confined in an institution as a chronic maniac for the period of twenty-three years. A sister of defendant's grandmother also became insane and was confined in an asylum. According to the testimony of defendant's father, it appears that defendant's health was poor when he was an infant; that he was treated for cholera infantum; that he was severely afflicted with asthma from the time that he was three years old; that when ten years old, he had a severe attack of malaria; that he never was a drinking man; that he would become despondent and nervous when out of a job; that he could not endure much grief or excitement, and that a little argument would put him out of his mind; that he had a limited education, did not like to go to school, and little more than finished the fourth grade. According to the testimony of Maude Sholty, psychologist, who examined the defendant while in jail and gave him the so-called Benet test, defendant's mental capacity was that of a child of ten years and six months of age.

About 1917 defendant worked in a saw-mill, and thereafter, for awhile, was time-checker for the George A. Fullen Construction Company. In 1918 he made application for a job as a fireman on a railroad. He was accepted, but on account of his limited education required assistance in order to pass his examination. In 1919 he was afflicted with syphilis. On account of his asthma, he soon thereafter went to Houston, Texas. From 1922 to 1928 he was fireman of a locomotive at Jacksonville, Texas. In 1929 he came to Cheyenne, and in the following five years, worked for the Union Pa-

cific Railroad Company, although laid off at intervals. During 1934 he worked for that company at Laramie, was transferred to Cheyenne, and re-transferred in the early part of 1935 back to Laramie, where he stayed until he was discharged, about September 29, 1935, on account of drinking intoxicating liquor in violation of Rule G of that company. On September 28, 1935, just immediately prior to his discharge he took a number of intoxicating drinks at Laramie, became engaged in a severe and bloody fight, and was put in jail, where he remained for about eight hours. Defendant claims that he does not remember the fight, or what happened after he had had a few drinks; that he "passed out." The chief of police of the City of Laramie, and the sheriff of Albany County, testified that while defendant was pretty drunk and abusive, he attempted, the next morning, to get them to hush up the matter so as to keep knowledge thereof from the railroad officials. According to Mr. Brubaker, the defendant stated on the morning of September 29, 1935, that if it were not for his mother and sister he would get a gun and kill himself. The defendant himself testified that he became discouraged when he was discharged; that he started drinking and gambling; that he came to Cheyenne, lived with his friend Brubaker and his friend Uchner; that during the week preceding the homicide he got drunk one night and "passed out"; that it did not take much whiskey to make him drunk; that he made up his mind to kill himself; that he felt that he was going insane; again, that he decided to go to Kansas City. He had, in fact, a pass on the railroad, issued on October 3, 1935, which expired on October 28, 1935. On Thursday preceding the homicide, he called on Ella C. Smith, apparently a friend, stated to her that he was going home, that he had means of transportation, but that he had no money and wanted to borrow $5.00. He was corroborated by Ella C. Smith. She let him have

$5.00. What became of it is not clear. On October 24, 1935, he wrote a letter, apparently never sent, introduced in evidence by the defendant, to his sister and mother and father and brothers, telling them not to worry about him; stating that the railroad officials assumed too much authority, and that it was none of their business what he did when he was not actually at work. On Friday and Saturday night of that week, according to defendant's testimony, he bought a gun. He did not, he stated, know where he bought it, what kind of a gun it was, or the exact time when he bought it, or with what money he bought it. He claims that he was drunk at the time; that he also gambled away his overcoat, which, however, was returned to him, and was left by him with Mrs. Smith. The witness Brubaker corroborated the defendant to the effect that during that week the latter was drunk, and Mrs. Smith testified that defendant, when she had a talk with him on the Thursday preceding the homicide, was very despondent, showed signs of great mental suffering, was incoherent and jumped from one subject to another; that he had spells of weeping and of laughter and stated that his future did not seem to hold anything for him. During that week, the defendant called upon the deceased, Superintendent of the Wyoming Division of the Union Pacific Railroad, to induce him to reinstate him. The defendant was told "that he was through." According to the witness Hanson, the accused, when leaving Barnard's office, had a mean, vengeful look upon his face which caused the witness to worry. On Sunday morning, the day of the homicide, the defendant arose reasonably early and went "downtown." According to the witnesses Robitaille and E. P. Peterson, he was at the Union Pacific depot between 10:30 and 11:00 o'clock, a. m., reading the Denver Post, and they saw nothing indicating that defendant was not sober at that time. Later in the day, and per-

haps about noon, defendant met the witness Brooks, an old acquaintance, near the Normandie Hotel. Defendant and Brooks consumed a half pint of whiskey. Then they met Brown, Hampton, and Jim Morron. The five men were together until about 3:30 p. m. Brown, Brooks and defendant drank a pint of whiskey. According to the testimony of Brown and Brooks, witnesses for the defendant, the latter did not drink his share, and refused to take a drink with them three different times. It further appears from their testimony and that of Hampton that, while defendant was under the influence of whiskey, he was not drunk; that he did not want to drink too much, talked of fear of being fined, and that about 3:30 o'clock in the afternoon, at the Asher warehouse, he insisted upon leaving them so that, as he stated, he would not get into trouble with the others for drinking; that he got out of the automobile; that they attempted to get him back into it, but that they were unable to do so, and that the several parties thereafter separated. One R. H. Sharp, witness for the defendant, claims to have seen the defendant under the influence of intoxicating liquor in an alley near the Normandie Hotel at about 3:45 p. m., with the witness Brooks. This is inconsistent with the testimony of Brooks. The defendant himself claims that he had two drinks previous to the time when he met Brooks at the Normandie Hotel; that he drank the half-pint with Brooks as above mentioned; that the witness Brown brought a new and additional pint of whiskey out of the Eagles Hall, which, too, was consumed—a statement inconsistent with the testimony of the other witnesses. Defendant further claims that, from approximately three o'clock in the afternoon of the day of the homicide, up to about six to seven days thereafter, he was afflicted with amnesia, remembering nothing of what happened, and that he first learned of the homicide through information received at the

hospital. This claim is contradicted, aside from the testimony above mentioned, by a number of witnesses for the state. Irene Hopkins and Betty Nesson, waitresses at the dining room of the Union Pacific Railroad Company, testified that they saw accused in the dining room about 5:30 p. m., or shortly thereafter; that he ate a meal; that the deceased, C. C. Barnard, also was eating a meal in the dining room at that time; that the defendant showed no signs of intoxication. The witness Kenworthy saw the defendant walking along the streets of Cheyenne shortly previous to that time. The witness Violet Shuttleworth, news stand attendant in the Union Pacific depot, saw the defendant come into the depot; about 6 o'clock p. m., she talked with him; he showed no signs of intoxication at that time. He entered the depot from the northwest, walked past the news stand, saw the deceased in the northeast part of the depot, talking to the witness Adamson, with his back toward defendant, stopped, spread his legs, pulled his gun, held it over his head, and shot the deceased three times and thereupon shot himself in the breast. Barnard apparently died instantly. Defendant fell, and was wounded so severely that there was a doubt for some time as to whether or not he would live. When the defendant was being placed on a stretcher, Mr. Kenworthy, special agent for the Union Pacific Railroad, felt of defendant's pockets to find out whether or not he had any other weapon upon him. The defendant stated, "If I had, it would be for you. You are just as dirty as the rest of them." This statement, with some slight variations, was testified to by a number of witnesses. The defendant was taken to a hospital. George J. Carroll, Sheriff of Laramie County, Wyoming, called on him soon thereafter. He asked him his name and whether he was in pain; he could not detect any liquor upon his breath at that time, although he was within a few inches of his body. The sheriff testified that he

asked the defendant if he was suffering much. The latter answered that he was, "but that he did not want anything done to help him, as he wanted to die; he asked everyone who came, for a gun, so he could finish the job; said he was tired of being made a tramp and that no son-of-a-bitch was going to put him in a box-car again; that he did not want any one to think that he was drunk or crazy; that he knew just what he was doing, and he did just what he intended to do; that he did not want any sympathy, and he did not want any one to think that this was any 'insane-ity' talk * * * that he would have got the other son of a bitch but I could not stand up long enough." Later in the evening, the sheriff returned to the hospital with some guards. The defendant was still talking, stating "that he had been put on the bum, and that no son of a bitch of a railroad man was going to put him on the tramp again; that he had been discharged for Rule G in Laramie about a month previously, and that he did not think it was any of their damn business what a man did when he was laying off." The sheriff saw the defendant again on November 1, and took the latter's brother to the hospital. The sheriff testified that at that time accused repeated some of the things already heretofore mentioned; related that three or four days previously he went to Barnard's office asking the latter for a reinstatement or a satisfactory service letter, and that Barnard answered that he, Carroll, was all washed up; that as long as he, Barnard, was superintendent of the Union Pacific Railroad, Carroll would not be re-employed by that company; that he, accused, said to Barnard, "I said 'I thank you' because I knew right that minute that he was not going to be superintendent of the Union Pacific very damn long"; that defendant also talked with his brother about his personal effects and told the latter that he had sold or pawned most of them "because I knew I was not going to need them

very much longer." This incident is corroborated by the witness Dewey Homan, undersheriff at that time, who further testified that he acted as defendant's guard from October 28 to November 4 inclusive; that he went to the hospital about 8:20 in the forenoon of October 27, 1935; that the defendant was then asleep; that when the latter awoke, he asked the witness what he was doing up there; that witness answered that he just came to keep him company; that later in the day, the accused asked what witness had heard about Barnard; that witness informed him that Barnard was dead; that the defendant then said "That is all right; that son of a bitch will never fire anybody else. That is three to my credit." Later, accused said all of a sudden—according to Homan—"Well, I have been railroading quite a while and I made up my mind that those guys were not going to make a tramp out of me again. * * * Had I bought a machine gun instead of that little six-shooter and got a dozen of those fellows instead of one and then done a good job on myself I would have been a hundred per cent * * * I am going to die, I want to die; I have nothing to live for; * * * It is just too bad that the job is not done on myself. * * * Three or four nights ago I could have done a better job than that and I didn't have the guts. I put that little six-shooter in my pocket and I went down there to get some of those birds. I walked through the depot and went out on the platform of the depot, in front of the depot, and Mr. Williams and Mr. Barnard were standing out there together; I had the gun right in my pocket and I thought 'that is a damned good chance to get two of them." I walked right around them, I hesitated a couple of times, walked up closer to them, and all of a sudden something came over me and I said 'that would be a hell of a position to put my mother and my sister in.' I left the gun in my pocket, turned loose of it, walked around the depot, and hid

the gun out. I went down there Sunday evening, and I saw Mr. Barnard and I made up my mind right then and there." The defendant had previously told the witness about his visit to Barnard's office, and stated: "I just politely bowed and said 'thank you, Mr. Barnard' and turned around and walked out. As I walked through the door I made up my mind 'you son of a bitch, you are going to pay for this.' "

The witness E. B. Brown, undersheriff of Laramie County, also saw the defendant during the time that he was in the hospital and also heard him make some statements. He testified that the defendant at that time appeared rational and seemed to know what he was saying; that on the night of October 27, 1935, the defendant talked a good deal after the others had gone and while witness was in the room alone with the defendant. Part of the testimony is as follows: "He told me that his name was P. H. Carroll; that his home was in Beaumont, Texas; that he was thirty-six years old November 28th; that he had a mother and sister there; that his sister was twenty-one, and his mother seventy-one; that he was not crazy, and had had two drinks; that he went down there on purpose to kill him; that he (Barnard) was not going to fire another man; that he looked for Kenworthy and wanted to kill him, too; that he talked to Barnard on Sunday, October 20th, at which time Barnard told him he (accused) was all washed up; that he thanked him, and made up his mind right then that he (Barnard) would never fire another man; that he (accused) had planned this for twenty-eight days; that he did not want people to think he was crazy, like they did the other fellow, because he knew just what he was doing; that he was not drunk, either; that he bought the gun in Cheyenne and gave three dollars for it at a pawn shop."

After the defendant was removed to jail, about November 4, 1935, he acted, according to the witness

Petry, as a normal prisoner. During that time he was examined by Maude Sholty, psychologist, as above mentioned, and also by Dr. Daniels, acting on behalf of the defendant, and also by Doctors Work and Young, acting on behalf of the State. Dr. Daniels testified that from his examination of the defendant he concluded that the latter was simple-minded and mentally deficient; that he was unable to control his emotions and impulses as a normal person should; that under stress he would be apt to become mentally unbalanced; that he was unduly susceptible to the effects of alcohol; that alcohol has a definite effect on the memory, which is especially marked in certain individuals; that syphilis is one of the causes of insanity; that defendant's mental condition was such that at the time of the homicide he could not voluntarily resist the taking of whiskey, and that he was insane at the time. Dr. Mylar also testified on behalf of the defendant. He attended him at the time when he was in the hospital. He testified that for a number of days after defendant was removed from the hospital, he was not accountable for any statements made by him, and that at the time of the homicide defendant was not able to distinguish right from wrong. His testimony was somewhat weakened by testimony of contradictory statements made by the witness soon after the homicide. The testimony of Drs. Young and Work will be mentioned hereafter. They both testified that the defendant was sane at the time of the homicide.

1. *Cross-Examination of Expert.*

When Dr. Daniels was upon the witness stand, he was asked by the prosecuting attorney on cross-examination, whether, in the doctor's opinion, the defendant was fully aware of the seriousness of his act, if he, the defendant, wrote letters to his father, mother and sister, to the effect that he, the defendant, did not want them to come to his trial; that he had no chance, and

that he was not going to fool himself; that his chances were no greater than a "snowball in hell," but that he was ready for it. The doctor answered that counsel had evidently not understood him. No objection was interposed to the question. Later the defendant made a motion to have the question stricken "on the ground and for the reason that said questions were improper and that the letters referred to therein were written in the county jail some three or four weeks after the alleged homicide and said letters so referred to are prejudicial to this defendant, and the question was improperly asked." The court, after some hesitation, overruled the motion. Counsel seems to think that the action of the court was erroneous, because the letters mentioned were never introduced in evidence. However, some latitude must be allowed in cross-examining an expert. In Lawson on Expert and Opinion Evidence, 2nd Ed., page 274, the rule is laid down as follows:

"On cross-examination it is permissible, for the purpose of testing his skill and accuracy, to ask the witness hypothetical questions pertinent to the inquiry, assuming facts having no foundation in the evidence."

In the case of Bever v. Spangler, 93 Iowa 576, 61 N. W. 1072, the court said:

"It is insisted that the court allowed co-defendant's counsel too great liberties in cross-examining proponent's witnesses, particularly the experts used by them. The rule is well understood, we think, that experts may be cross-examined on purely imaginary and abstract questions, assuming facts and theories which have or have not foundation in the evidence, and that the allowance of all such questions rests in the sound discretion of the court. Where such discretion is fairly exercised, we will not interfere."

In the case of Taylor v. Star Coal Co., 110 Iowa 40, 81 N. W. 249, the court said among other things:

"The cross-examination of some of defendant's ex-

pert witnesses was objected to because the questions assumed a state of facts not in evidence. In cross-examining such a witness it is not necessary that the examiner confine himself to the facts established in the case. He may assume almost any state of facts, for the purpose of testing the witness' credibility, and the extent of his knowledge."

See to the same effect Underhill on Criminal Evidence, 4th Ed., page 447, where it is stated that an expert witness may be questioned on assumed facts other than those in evidence. In view of these authorities, it is not clear that we can say that the court abused its discretion in the case at bar. Particularly is that true in view of other testimony in the case. Dr. Work testified without objection in part as follows: "I asked him point-blank what he thought was going to become of him, what he thought the outcome of this would be. He said he was going to be hung. * * * He said, 'That fellow (referring to Mr. Caldwell) is going to see that I get hung. There is nothing I can do about it, and they (his folks) might as well keep their money at home because it won't do them any good to come up here and see me.' * * * I asked him again if he understood that I was working with the district attorney's office * * * and he said he knew that. I asked him if he thought I was trying to frame him, and he said no, but I was working with a gang that was. He said 'You don't get anywhere when you go up against the state or the Union Pacific Railroad in this town.' "

This testimony disclosed substantially the same facts which were mentioned in the letters referred to by the prosecuting attorney. And the action of the court above mentioned cannot, accordingly, be held to have resulted in prejudice to the defendant.

2. Counsel for the accused argues that evidence of statements made by the accused at the hospital should not have been admitted for the reason that the defendant was not rational at that time. Dr. Mylar testified

that the defendant was not a rational human being during the first thirty-six to forty-eight hours after he was taken to the hospital, and it is argued that his testimony is the best evidence of the defendant's mental condition. Some of the state's evidence directly shows that the defendant, when he made the statements admitted in evidence, was rational. The statements themselves on their face show that they were made by a rational human being, even though made while the defendant was in a serious physical condition. Whether or not a person appears to be rational may, we think, be shown by a witness, though not an expert. 32 C. J. 759. Furthermore, Dr. Mylar's testimony was impeached. We think that the testimony complained of was properly admitted. The jury was competent to determine as to whether or not the statements were those of a rational human being.

3. It is further claimed that the statements just mentioned were not made voluntarily because the defendant was in the custody of the sheriff. He was not, technically at least, under arrest when he made the main statements in evidence, which were made at the hospital. The point is not of importance, however. The record clearly indicates that the statements were not made in response to any questions put to him by an officer of the law, but were made because the defendant wanted to talk. It is stated in 16 C. J. 629, that "an admission which was made voluntarily by accused may be received in evidence against him even though it was made to an officer, or while accused was under arrest or in custody." The rule was approved by this court in State v. Rotolo, 39 Wyo. 181, 270 Pac. 665. See also Strand v. State, 36 Wyo. 78, 252 Pac. 1030, and Clay v. State, 15 Wyo. 42, 86 Pac. 17, 544. We think there was no error in admitting the statements on the ground here under discussion.

4. One William E. Petrie, jailer of the Laramie

County jail, was called as a witness by the state and he testified that he observed the defendant while in jail. He was also permitted to testify that the conduct and actions of the defendant appeared to be that of a normal prisoner. It is contended that this was a conclusion of the witness and that the testimony should have been excluded. We think that the evidence was proper, and that the objection is without merit. 22 C. J. 557.

### 5. *Expert Testimony—Hypothetical Question.*

Dr. Work was called as an expert by the state to testify to the defendant's sanity. He examined the accused while in jail on December 1, 1935, again on February 22, 1936, and also saw and observed the defendant on the witness stand during the trial of this case, and he heard all of the testimony. He testified, in effect, that during his examination of the defendant he found him to be a normal man; that the insanity of the relatives of the accused is of no importance; that he found nothing suggestive that the defendant was afflicted with syphilitic disease or any syphilitic symptoms indicating any effects upon his mentality; that the Benet test is of minor importance in testing the sanity or insanity of a person; that defendant was neat and tidy; that he had as much grasp of the details of railroading as most switchmen; that for a man of his position in life and education he had a rather remarkable memory; "Speaking solely at the moment of his demeanor upon the witness stand I came to the conclusion that he showed at that time a rather remarkable grasp and recollection of his past life, the events of it and their interrelationship; that he had himself in the main quite well under control." The doctor testified in detail as to the effect which drinking intoxicating liquor might have had upon the defendant. He told of the symptoms existing in alcoholic insanity; that such insanity is characterized by mental deterioration, by

certain delusions, suspicions of persecution, and that
amnesia exists very rarely; that during his examina-
tion of the defendant he found none of these symptoms
to exist; that on the contrary the defendant seemed to
have the average amount of interest in what was going
on; that he was under no mental strain; that his emo-
tions were under control; that he had no delusions and
no hallucinations. Part of the testimony relating to the
examination on December 1, 1935, is as follows:

"On getting down to the specific episode, the killing
for which he now stands charged, I asked him this
question: 'When did this shooting take place? A. It
was Sunday. Q. What time Sunday? A. I don't re-
member. Q. Was it morning or afternoon? A. It was
afternoon some time. Q. Early in the afternoon, or
late in the afternoon?. A. Late afternoon. Q. Where
was the shooting? A. The depot; that's where it was.
Q. You usually carry a gun? A. No sir. Q. How did
you happen to have one on that day? A. I bought a
gun to kill myself. Q. When? A. I bought it, it must
have been Friday or Saturday. Q. Where? A. I don't
remember; Cheyenne junk shop. Q. How much did you
pay for it? A. Three dollars. Q. What kind of a gun
was it? A. Thirty-two. Q. Automatic? A. No; pistol.
Q. You bought that Friday or Saturday? A. Yes sir.
Q. You do not remember where? A. No sir? Q. What
is the big idea in trying to kill yourself? A. He wouldn't
give me a service letter and I figured I had nothing else
left. Q. The Brotherhood would have taken care of
you? A. No. Q. Do you think you are insane today?
A. No, I am not insane. Q. Do you think you were in-
sane the last time you talked with Mr. Barnard, a week
or so before this happened? A. I was not. Q. What
does being insane mean to you? A. I think you are
crazy; just off; you have no sense; in fact 99% of the
world is that way all of the time, in my estimation.
Q. Why? Because they don't agree with you? A. No;
just the way they act. Q. How long a time do you
suppose there was you didn't know what was going on?
A. Three or four hours; I would say three hours. Q.
When did that three hours begin? A. From somewhere
in the afternoon. Q. When was the next thing you knew
anything about? A. Three or four days afterwards."

During the second examination, however, the defendant denied having any knowledge of the shooting at all. Toward the beginning of the doctor's testimony he stated: "I might state that any opinion that I am asked to and do give here will be based on my examination and my knowledge and reading of my subject and what I have seen of the defendant in the court room, the testimony bearing on his condition that I may have heard in the court; I think that I have heard it all. I mention that at this time because I think it would simplify the story." Later he was asked whether or not he had an opinion of the mental state of the defendant on October 27, 1935, and he stated that he had. Asked what it was based on, he answered: "It is based primarily upon my examination of the patient and my knowledge of mental diseases." At that time, however, he was not asked, nor did he state, what that mental state was, and after some further testimony the following proceedings took place:

"Dr. Work, from your examination of the defendant and after having heard the testimony in court, do you have an opinion as to whether or not the defendant was feigning or simulating insanity at the time of the crime?"

This was objected to as invading the province of the jury. The court then stated: "I think the question should take into consideration the observation of the defendant in court also. You had better re-frame your question." The question then was asked:

"Dr. Work, from your examination of the defendant and from your observation of the defendant in court, and from the testimony in court, have you any opinion as to whether or not the defendant was feigning or simulating insanity on October 27, 1935, that being the date that Carroll killed Mr. Barnard?"

Over objection, he stated that in his opinion the accused was feigning, and over further objection he

stated that the defendant in his judgment was sane at the time of the homicide. The objections were, that there was a conflict in the testimony and that for that reason the witness could not state what his opinion was, if based upon such testimony; that by his testimony he would invade the province of the jury, and that whatever question was put to him should be in a hypothetical form. The objections were overruled, and this is assigned as error herein. Counsel states in his brief that "There was conflicting testimony as to how much intoxicating liquor had been consumed by appellant the afternoon of the homicide and as to his actions when under the influence of liquor. There was conflicting testimony as to whether or not he was acting peculiarly prior to the homicide. There was conflicting testimony as to what Dr. Mylar said with reference to his condition."

The cases generally hold that if the testimony is conflicting an expert witness cannot be asked for his opinion which is based upon such testimony. The cases on the subject are collected in note 82 A. L. R. 1478 to 1489; 98 A. L. R. 1190; Wigmore on Evidence, 2nd Ed., Sec. 681. The main reason assigned is that the jury should know the basis or premises upon which the conclusion of the witness is founded, and that if the basis is not known, the conclusion is worthless. It is undoubtedly true that unless the jury know the premises, they are not able to appraise the value of the conclusion. Still, they might give an undue weight to such conclusion, when they have confidence in the expert. But, after all, we are here confronted with a matter of practice, and it seems somewhat strange that so little weight has been given by the courts to the opportunity possessed by the defendant as well as the state, to find out upon what premises the conclusion is based. Furthermore, in some cases, an opinion, though based upon conflicting evidence, is apt to disclose the

basis thereof. Take the case at bar. The testimony as to the amount of intoxicating liquor which was consumed by the defendant was conflicting, but the main conflict was brought about by defendant's own testimony. He stated that more was consumed than the amount mentioned by his own witnesses; he testified that he knew nothing of what happened after about three o'clock in the afternoon; inconsistent therewith is the testimony of his own witnesses. When Dr. Work gave his opinion that the defendant was feigning amnesia, the jury knew, necessarily, that the doctor did not believe the testimony of the defendant. In other words, they knew the basis, the premises, upon which he based his opinion. It is true that he incidentally passed upon the credibility of the defendant. That is ordinarily the function of the jury, and not that of a witness. And many of the cases require a hypothetical question where the testimony is conflicting, upon the additional ground that the witness should not usurp the province of the jury. Professor Wigmore, in his work on Evidence, 2nd Ed., Sec. 673, believes this to be a false theory. "The expert," he states, "could not usurp that province if he would, because the jury may still reject his testimony and accept his opponent's." And we can hardly believe that in this case the jury were deprived of their right, duty or ability to pass upon the credibility of the defendant merely because Dr. Work did not believe him.

Wigmore on Evidence, 2nd Ed., Sec. 686, states:

"The hypothetical question must go, as a requirement. Its abuses have become so obstructive and nauseous that no remedy short of extirpation will suffice. It is a logical necessity, but a practical incubus; and logic must here be sacrificed. After all, Law (in Mr. Justice Holmes' phrase) is much more than logic. It is a strange irony that the hypothetical question, which is one of the few truly scientific features of the rules of evidence, should have become that feature which

does most to disgust men of science with the law of evidence. The hypothetical question, misused by the clumsy and abused by the clever, has in practice led to intolerable obstruction of truth."

The author suggests that the remedy for any prejudice which might result lies in the right of cross-examination on the part of opposing counsel. In the case of State v. Riley, 147 Ore. 89, 30 P. (2d) 1041, an expert had had the defendant under observation as to his sanity, and had also heard the testimony of the witnesses for the defendants. He was asked his opinion as to defendant's sanity, based upon the testimony as well as upon his observations. It does not appear whether or not the testimony was conflicting, so that we cannot say that the case is in point here, but we refer to it mainly because the court calls attention to the right of cross-examination mentioned by Professor Wigmore. There is one case, however, which seems to be in full accord with the opinion of the eminent author in his work on Evidence. That is Commonwealth v. Russ, 232 Mass. 58, 122 N. E. 176. The court stated as follows:

"The correct practice as to the introduction of such testimony is well settled. The competency of an expert witness to testify to his opinion rests upon unusual knowledge and extraordinary experience, superior to that of ordinary persons. The witness, being qualified in this particular, then may base his opinion upon facts observed by himself or within his own knowledge and testified to by himself, or upon facts assumed in the questions put to him and supported either by admitted facts or by the testimony of other witnesses already given or to be given at the trial, or upon facts derived partly from one source and partly from the other. It is not necessary in all cases that the facts be stated in the form of an hypothetical question, although this is generally permissible. Where an opinion is sought upon substantially uncontradicted testimony heard by the witness with or without personal observation on his part, the question may be asked upon that express

or implied assumption without reciting the testimony in the question. Where there is conflicting testimony, a witness, who has been present in court and heard it, may be asked if he has formed an opinion as to a material point, respecting which his skill gives him requisite qualification to express an opinion, based upon that testimony or parts of it. If his answer is in the affirmative, then he may select and state the facts given in testimony which in his opinion, if true, are most significant and pertinent as aids in the formation of an opinion and to what conclusion his mind is led by the consideration of such facts. *In the trial of a criminal or other case, it is permissible to ask an expert witness if he has formed an opinion from his observations and examination and from testimony heard in court as to the point in issue about which he is qualified to give evidence. Upon answering in the affirmative he may be asked to state that opinion. The direct examination then may stop, leaving the other side to develop the reasons in whatever detail may be desired.* \* \* \* As to the order of introduction of evidence and the form of questions much must be left to the discretion of the presiding judge."

It may be noted that the court specifically states that an expert witness may be asked his opinion based upon his observation, examination and testimony heard in court, whether conflicting or not. That is the exact situation in the case at bar. In that respect the case just cited differs materially from most of the cases on the subject. It is hard to reconcile it with other cases from the same jurisdiction, unless the court meant to confine the rule therein stated to cases similar to that with which we are dealing here. We are not, however, called upon, we think, to adopt a definite rule which should govern in situations here mentioned, except to say that it would seem to be reasonable, at least in cases in which an accused is represented by counsel, that some consideration should be given to the right of cross-examination, even in face of the general rule that the state must prove the defendant's guilt by competent evidence, and that it would seem to be incon-

sonant with reason to reverse a case, after a lengthy and expensive trial, merely because the premises of an expert's opinion has not been definitely shown by the State, when, as stated before, the defendant's opportunity in that respect is as full and complete as that of the State.

We think that the requirement of the rule generally announced by the courts as above stated, has been substantially met in the case at bar. We have stated that Dr. Work testified that his opinion as to the sanity of the defendant was based primarily upon his examination of the accused and upon his knowledge of mental diseases. The authorities seem to be agreed that an expert may base his opinion upon an examination of an accused, particularly where he has stated to the jury the details of what he found. Wigmore, Evidence, 2nd Ed., Sec. 675, and cases cited; State v. Felter, 25 Ia. 75; State v. Roselair, 57 Or. 8, 109 Pac. 865; People v. Faber, 199 N. Y. 256, 92 N. E. 674, 20 Ann. Cas. 879; State v. Ross, (Mo.) 178 S. W. 475; Yates v. State, 127 Ga. 813, 56 S. E. 1017, 9 Ann. Cas. 620. While the last questions put to the doctor, and objected to herein, embodied the evidence in the case, it is reasonably clear that the doctor, nevertheless, based his opinion "primarily upon his examination of the accused and upon his knowledge of mental diseases." In fact, the opinion expressed categorically in answer to these categorical questions added little, if anything, to his testimony. He had already testified that the insanity of the defendant's relatives had no bearing in the case; that he found nothing, during his examination of the defendant, indicating insanity on account of syphilis, and that he found no symptoms indicating alcoholic insanity, upon which the defendant mainly relied. If the evidence in the case had, in fact, some slight bearing upon the doctor's opinion, that and the details thereof could easily have been discovered upon cross-examina-

tion. We conclude that there is no error in connection with the instant point under discussion.

6. Dr. Young also was called by the state as an expert. He was asked: "From your examination and from observing this defendant at the trial, the preliminary hearing and the present trial, have you any opinion of the mental state of this gentleman as of the date of the 27th day of last October? A. I have. Q. Doctor, what is your opinion as to the question of the sanity or insanity of this defendant at that time? Mr. Lathrop: We object to the question on the ground that it is improper; that it allows the witness to pass upon the evidence in the case, which is a province, an exclusive province, of the jury, and calling for the conclusion of the witness." The doctor was permitted to answer and he stated that he believed the defendant sane. He was then asked the following question: "Doctor, on what is your opinion based? A. It is based upon examination and also upon experience."

It may, accordingly, be noted that Dr. Young based his opinion upon his observation and examination of the defendant and his knowledge of the subject generally. As stated heretofore, that is permissible. Hence, no error was committed in permitting the doctor to state his conclusion.

7. *Cross-Examination of Accused—Insanity.*

The defendant, upon cross-examination, was asked in reference to his drinking, and among other things, as to whether or not he was drinking during 1922 to 1928, and he testified that he then had a regular job; that he was not a drinking man and did not drink much during that time. Then the record shows the following:

"Q. You were not drinking, then, when you killed Mr. Stuart in Jacksonville on May 18, 1926?
Mr. Lathrop: I object to that.
Mr. Dillon: It is a matter of fact. He has brought

out everything in his life and we want to know what he did there. It is not a question of another crime.

Mr. Lathrop: There is only one question he can ask, and he knows that.

The Court: The objection is sustained. Disregard that question and answer, gentlemen of the jury.

Mr. Lathrop: Counsel knows the only question he can ask.

The Court: All right.

Q. You were indicted, tried and acquitted?——

Mr. Lathrop: I object to the question.

The Court: Yes, the court has already ruled on this line of questioning. The objection is sustained."

The defendant assigns the asking of these questions as error, as attempting to show a collateral crime, not pertinent to the case. Counsel for the defendant has somewhat misconstrued the purport of the question. It is not whether the defendant killed Stuart and was acquitted after trial, but whether he was intoxicated on a certain occasion. At least the main part of the question relates, or may be construed to relate, to the fact and incidents of defendant's intoxication. The homicide in 1926, followed by trial and acquittal, are mentioned merely to state the time, place and circumstances. Counsel will naturally maintain the prosecution used but a subterfuge to bring in a collateral crime, and if that is true, and the question as a whole is not germane to the inquiry in the instant case, it should not have been asked. 70 C. J. 628. Counsel for the accused cites, among other cases, State v. Jones, 48 Mont. 505, 139 Pac. 442, where it is said:

"It is never proper for counsel to so frame questions as to assume the existence of facts which are not admissible if offered as independent evidence."

That statement, however, is too broad, and is inconsistent with the case of State v. Eads, cited infra, for in that case, the prosecuting attorney assumed a state

of facts which could not have been admissible as independent evidence.

Courts are in hopeless conflict as to the permissible extent of cross-examination of a defendant relating to a collateral crime or act. The cases on the subject are collected in 70 C. J. 882 to 888, in 6 A. L. R. 1608 to 1648; 25 A. L. R. 339 to 348, and Wigmore, Evidence, 2nd Ed., Sec. 987, where the author separates the cases dealing with extrinsic evidence from cases dealing with the extent of cross-examination. In Eads v. State, 17 Wyo. 490, 101 Pac. 946, it was held that a question put to an ordinary witness on cross-examination as to whether or not he had been arrested and convicted of carrying a concealed weapon was properly excluded. In that case, and more clearly in Anderson v. State, 27 Wyo. 345, 373, 196 Pac. 1047, and followed in State v. Vines, 49 Wyo. 241, 54 P. (2d) 826, it was held that extrinsic evidence to contradict a witness on a collateral matter is improper. In Rosencrance v. State, 33 Wyo. 360, 239 Pac. 952, a question was asked of an ordinary witness as to whether or not he had been charged with gambling in another case. That was held to be improper. In Pinkston v. State, 33 Wyo. 428, 240 Pac. 219, an ordinary witness was asked whether he did not run a house of prostitution. The question was held proper, as involving moral turpitude. In State v. Sorrentino, 31 Wyo. 129, 224 Pac. 420, a defendant on trial for murder was asked when it was that he had paid a fine for moonshining. The question was held to be improper. In line with the Rosencrance case, but applying the rule to an accused, it is said in notes, 6 A. L. R. 1611, 1616, 1624, that it is generally held that inquiries of an accused on cross-examination as to prior arrests or previous indictments are not competent to affect his credibility, and that "the tendency seems to be to exclude questions as to a previous trial not resulting in a verdict of guilty." In the case of

People v. Cascone, 185 N. Y. 317, 78 N. E. 287, it was held that it is improper to ask a defendant on cross-examination whether he has not previously been tried for a crime unless it appears that he was convicted, because a trial followed by acquittal is but an accusation successfully met, and does not tend to discredit a witness, and is incompetent for that purpose. Hence it would seem that a question merely intended for the purpose of disclosing the trial and acquittal in 1926 would not have been proper, and it should not have been asked unless the matter was pertinent for other reasons, or was within the legitimate scope of cross-examination, in view of the direct examination. And we shall proceed to consider that phase of the case.

The defendant testified that he had no grudge against the deceased; that he did not ordinarily drink much; that it did not take much intoxicating liquor to make him drunk; that intoxicating liquor would go to his brain instead of his stomach; that "it turns me nuts every time I drink." He related his intoxication in Laramie on September 28, 1935, and the severe and bloody fight in which he was engaged at that time, and claimed that as a result of his intoxication he became afflicted with amnesia; that is to say, that he did not know what had taken place. He related other incidents of a similar nature which took place in Cheyenne. Among other testimony, the following questions and answers appear in the record: "Q. You must have some happy faculty to take a few drinks of liquor and somehow or other you are just wildly drunk. A. I get crazy. Q. Crazy? A. Absolutely * * * Q. When you go crazy, you fight and are abusive? A. Right." In other words, the defendant attempted to give the jury to understand that the homicide here in question took place because, and only because, of his intoxicated condition and the amnesia following it. He attempted to show a general disposition, character, or trait, that

when he became intoxicated he would fight, be quarrelsome and abusive, and that at the same time he would know nothing of it. He thus put in issue his character for violence under the conditions mentioned. He attempted to illustrate or emphasize such general disposition, character or trait by the fight at Laramie and by fights or abuses at Cheyenne. But why not illustrate it further? It was the basic foundation for his defense, or at least for indulgence at the hands of the jury. The actual existence of such disposition, character, or trait was important to him. Upon that mainly rested his case. The incidents of the homicide at Jacksonville, accordingly, if it took place, had a peculiar significance. If such general disposition, character or trait existed at that time, evidence to establish it or fortify it by incidents of that time was as competent as evidence by which he tried to establish or fortify it by the incident which took place at Laramie. As was said in Myers v. State, (Tex. Crim Appeals) 177 S. W. 1167, 1173: "The evidence of his condition six or more years ago would be admissible on the issue of what his condition was at the time of the homicide, if there were any facts or circumstances introduced in evidence tending to show his mental condition to be other than that of a sane man at the time of or immediately preceding the homicide." The plea of temporary aberration of the mind made in the case at bar presented at best but a weak defense. Such plea, under circumstances as disclosed herein, in the very nature of things arouses suspicion. The average man would, ordinarily, reject it at once as furnishing but a pretext. By evidence of a substantial character, however, showing that under similar circumstances previously his mental condition was the same, more ready credence would probably be given to his plea. Hence, if as a matter of fact the homicide at Jacksonville took place by reason of defendant's intoxication followed by amnesia—in other

words, if the question or questions of counsel for the prosecution had been answered to the effect that he was drunk at that time, it would seem that this would have strengthened the defense and would have had considerable influence on the jury in favor of the defendant, at least in so far as the degree of crime is concerned, notwithstanding the fact that the disclosure of the homicide would have a tendency to his prejudice. We do not know what the defendant's answer would have been. Hence we are unable to say that the question and answer would not have been favorable to the defendant, instead of prejudicial. If this conclusion is correct, then it would, upon first blush, at least, seem to follow that if the defendant had answered that he was not drunk on that occasion, this would have weakened his defense. Not necessarily so, of course. The homicide might have been committed for other reasons, as, for instance, in self-defense. Simply because defendant had a general disposition or character or trait to commit acts of violence when intoxicated would not show that he would not act in self-defense when sober. However that may be, the state, in view of defendant's testimony, properly, on cross-examination, inquired as to whether or not the character or trait above mentioned existed in 1926. And in view of the defendant's further testimony as to his fight at Laramie and the incidents in Cheyenne, the state had a right, in that connection, to inquire as to other fights, if not too remote. Was it legitimate cross-examination to go further and make mention of the homicide in 1926? The defendant, as stated, claimed to have a certain trait, character or disposition. He opened the door for inquiry into that subject. It is too clear for argument that the state thereupon had the right to inquire into the extent, the strength, or weakness, of that trait or character. In fact, that is the very thing which the defendant did by his testimony relating to the incidents

at Laramie and Cheyenne already mentioned. He merely did not go as far as the state attempted to go. There is herein involved a mental trait—with limitations, it is true, but still a mental trait. It is said in 32 C. J. 760 that: "Where a person has put in issue his sanity, at a particular time, the other person may in rebuttal inquire into his condition before and after that time." In U. S. v. Holmes, 1 Cliff. 98, Fed. Cas. No. 15,382, it is said that: "Evidence of acts, conduct, and declarations, both before and after the time of committing the act tending to show an insane state of mind are also admissible as having some bearing upon the exact point in controversy." In Robinson v. Adams, 62 Me. 369, 413, the court, speaking of insanity, states that: "The rule allows great liberality to both parties as to the kind of evidence and as to the length of time over which it extends." See also Anderson v. State, 209 Ala. 36, 95 So. 171; Bower v. Bower, 142 Ind. 194. When the defendant himself chooses to testify to incidents previous to the act for which he is on trial, showing the particular mental trait involved, he can hardly expect that the State should be confined to limit its cross-examination to those particular incidents. In the case of Wright v. Tatum, 5 Clark & Finneley 670, 7 English Reprint 559, 575, the question arose as to whether or not letters received many years prior to the time when the deceased made his will, were relevant to determine the insanity of the deceased at the time of the execution of his will. It was held that they were not admissible, because of the fact that it had not been shown that the deceased did any act with reference to them, but it was held, in effect, that if some act of the deceased with reference to them had been shown, they would have been admissible. And in that connection Justice Pattison said:

"The issue (the insanity) in this case embraced the consideration of Mr. Marston's (the deceased) state of

mind during the whole of his long life, and, as it seems to me, every act of that long life might be shown and was relevant to the proper determination of that issue. * * * Every act of the party's life is relevant to the issue. Of course, therefore, anything which he can be shown to have done in regard to any written document, being evidence, it follows that such written document must itself be received."

Approving the statement thus made, it is stated in 1 Greenleaf on Evidence, 16th Ed., p. 58:

"Sanity and insanity are of course evidenced by the person's conduct; in fact (in the words of Mr. Justice Pattison), every act of the party's life is relevant to the issue."

The statement was also approved in Howard v. State, 172 Ala. 402. And in Anderson v. State, 209 Ala. 36, 95 So. 171, this rule is stated to have become a maxim of the law. The court, in connection with facts similar to those here, stated as follows:

"In the instant case the defendant did not testify, and the questions to which objections were made and sought to be propounded by the state were on cross-examination of a non-expert witness testifying to his insanity, and referred to other offenses and crimes purporting to have been committed by defendant. All of the information, knowledge, and opportunity of a non-expert witness on which is rested or which is the basis of the opinion of insanity were competent. It has become a maxim of the law, that where insanity is relied upon as a defense, every act of the party's life is relevant to the issue."

In the case of Hall v. State, 31 Tex. Crim. 565, the defendant was indicted for an assault to commit murder. The court said in part as follows:

"The defendant's theory of this case was, that he was too drunk at the time of the assault to form or entertain the specific intent to kill, and that the assault arose from a sudden impulse, and not from malice. To meet this, as well as to prove motive and malice, the

State was permitted to prove the acts of ill-treatment and bad conduct by defendant towards his wife, running back through several years, including threats to take her life; that they separated four times, the last of which separations occurred at Hot Springs, Arkansas, in April, 1892; that they had not lived together since the latter separation; and that each reconciliation occurred at his solicitation. To meet defendant's theory of temporary insanity produced from the recent use of intoxicating liquor, all such acts, previous ill-treatment, and threats were proper and legitimate testimony, to show malice, ill-will and motive on his part, and also as explanatory of his real purpose in making the assault alleged. The assault objected to was so connected with the other facts of the case as to render it admissible for the purposes indicated."

In the case of William Hopps v. The People, 31 Ill. 385, a case where the defendant was upon trial on the charge of murder, the court held, as sufficiently shown by two syllabi, as follows:

"As a general rule, where a party is on trial upon a charge of murder, it is not competent for the prosecution to prove that years previously he had committed another offense, as, violation of revenue laws by smuggling. * * * But where the defense is insanity, and the coolness and unconcern of the person at the time he committed the homicide are relied upon as justifying inferences favorable to the plea, it is competent to show that the prisoner had been in early years engaged in the perilous calling of smuggling, as tending to rebut the inference that his deportment on the fatal occasion was attributable to a want of sanity."

In Baker v. State, 190 Ind. 385, 129 N. E. 468, involving a charge for murder during robbery, and in which the defendant pleaded insanity, evidence of former robberies was held admissible, and the court stated that "on the plea of insanity, defendant's whole life was thrown open for investigation." An instruction, however, limiting the purpose of the evidence, was given. Wigmore on Evidence (2nd Ed.) Sec. 228,

discussing testimony admissible in connection with such a plea states that no single act of the defendant "can of itself be decisive; while on the other hand, any act whatever may be significant to some extent. The first and fundamental rule, then, will be that *any and all conduct* of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity. It certainly will throw light one way or the other upon the issue." The author has collected a number of cases on the subject. And see further Commonwealth v. Williams, 307 Pa. 134, 144 and cases cited; also People v. Lane, 101 Cal. 513, 36 Pac. 16. This rule, then, so clearly and unmistakably attested by numerous authorities, certainly permitted cross-examination on the homicide of 1926, in view of the testimony of the defendant relating to other incidents as above mentioned. The only reason, accordingly, which could be advanced why the question under discussion should not have been asked, is that it was unfair on the whole to disclose the homicide of 1926, thus applying the so-called auxiliary policy mentioned in Wigmore on Evidence, 2nd Ed., Sec. 983, where the author states that cross-examination of misconduct which would be legitimate enough for an ordinary witness would at times create unfair prejudice against the accused upon his cross-examination. But even if we should admit (which evidently Professor Wigmore himself would not do) that the question should not on that account have been propounded, it is altogether clear that we have here a situation entirely different from that presented in the ordinary cases in which counsel have been condemned for misconduct or which have been reversed because of questions relating to a collateral crime. The prejudicial effect, if any, could not have been nearly as great as claimed. The questions not having been answered left the jury in doubt as to

whether he would have answered them affirmatively or negatively. If he had answered that he was drunk on the occasion stated, it would probably have influenced the jury in defendant's favor. Not knowing whether he would have thus answered, it, as already indicated, left the jury of course in doubt, but, under the circumstances, no strong impression one way or the other was, probably, left on their minds. Again, the court sustained the objection and warned the jury to disregard the question, which, under the circumstances existing in this case, would probably have had greater effect than it might have had in other cases. Aside from that, it must be remembered that the testimony shows that the defendant, at the hospital, when told that C. C. Barnard was dead, said: "That is all right; that son of a bitch will never fire anybody else; that is three to my credit," meaning, perhaps, the shooting of himself and the deceased herein and the shooting at Jacksonville in 1926. The testimony further shows that the defendant said at the hospital: "Had I bought a machine gun instead of that little six-shooter and got a dozen of those fellows instead of one and then did a good job on myself I would have been a hundred per cent." It is apparent that if this testimony was to be credited, the error now complained of, if it was error, is of comparative insignificance and cannot, we think, be held to be prejudicial in the case, particularly in view of the fact that the testimony of the state showing the guilt of the defendant is strong and convincing. In the case of State v. Vines, supra, this court said:

"When guilt is clear, errors or incidents of unfair conduct by the prosecution may sometimes be ignored, but the greater the doubt of guilt the more likely are errors to the effect the substantial rights of the accused."

The question whether it is likely that the jury would have returned a different verdict than the verdict of

guilty of murder in the first degree must, we think, be answered, without hesitation, in the negative.

8. Counsel for the defendant argue that Instructions No. 1 and No. 3 given by the court are erroneous in that both of these instructions state that it is not necessary for the state to prove that the defendant was sane beyond a reasonable doubt before the jury should find him guilty. We find nothing in either of these instructions to that effect, and we find no merit in the contention. It is true that neither of these instructions, which make reference to what the state must prove, make any mention of the question of sanity or insanity, but Instructions No. 12 and No. 13 fully cover the point and correctly informed the jury as to the burden of proof on that phase of the case. It is not necessary for the court to mention every phase of the case in every instruction which is given. This assignment of error, therefore, must be overruled.

9. *Modification of Instructions.*

The jury, after having been out some hours, returned in open court, to ask the judge for additional information, both counsel for the defense and for the prosecution being present. The record shows the following proceedings:

THE COURT: I understand that what you desire is an interpretation or definition of the meaning of life imprisonment?

JUROR GNAM: Yes, sir. May I say something further on that, as to whether or not, where a penalty of life imprisonment can be given, any pardons, or commutations of sentence, or paroles, can reduce that?

THE COURT: Now, in answer to your question, gentlemen, Instruction No. 11 of course itself defines what is meant by "life imprisonment." It is defined in that instruction in these words: "be imprisoned in the penitentiary at hard labor for life." That is a defini-

tion of life imprisonment under the law. Now, in Wyoming, I will say to you first, that this being a case where the jury has the power of fixing the penalty, as to certain of the verdicts that are possible here to be rendered, and that being a fact, the Court will say to you that we have in Wyoming what is called the State Board of Charities and Reform; sometimes this Board is popularly referred to as the Board of Pardons and Paroles. That Board has certain powers with reference to criminal cases, and those powers could, if expressed or put into operation, apply to a life imprisonment sentence, as well as to sentences in other cases. They have a certain judgment and discretion that they can exercise as a State Board of Pardons and Paroles, and such powers as they have, if they are ever exercised, could be operative on a life sentence.

JUROR GNAM: Is there any definite time that this could be taken up? In other words, could it be done five years from now, ten years from now, or fifteen?

THE COURT: There is no set time.

JUROR GNAM: It could be done at any time?

THE COURT: Yes. That is a matter that rests in the discretion of this Board that I referred to; it is absolutely a matter of their discretion. Does that answer the question?

JUROR GNAM: I will ask the jurors.

THE COURT: Does that seem to answer the question fairly well?

JUROR GNAM: Yes, I think so.

THE COURT: All right. You may retire again with the bailiffs and take the instructions, of course, with you.

MR. LATHROP: The Defense excepts herewith to the giving of the above instruction and definition by the Court.

THEREUPON, the jury then retired for further deliberations.

It is contended that the statements of the court here set out was an attempted modification of Instruction No. 11, and therefore in violation of Section 33-902, Wyo. Rev. St. 1931, Subd. 6, which is as follows:

"Sixth—Before the argument of the case is begun, the court shall immediately, and before proceeding with other business, charge the jury, which charge shall be reduced to writing by the court, if either party request it, and such charge or charges, or any other charge or instruction provided for in this section, when so written or given, shall in no case be orally qualified, modified, or in any manner explained to the jury by the court, and all written charges and instructions, shall be taken by the jury in their retirement and returned with their verdict into court, and shall remain on file with the papers of the case."

We do not think that the statements made by the court can properly be considered to be an explanation or modification of Instruction No. 11. They relate merely to the power of the Board of Pardons, a power which cannot be and is not exercised until after conviction, and relates, therefore, to an extraneous matter. It is, however, contended further, that whatever statements were made by the court should have been in writing, under the provisions of the law above quoted. We think that this objection is technical. No such objection was made in the court below. It is at least doubtful that the statement can be considered as an instruction. It does not relate to the evidence, nor to the law applicable in the case. It relates to a matter, as stated before, which could be considered by the Board of Pardons only after a conviction. In the case of State v. Skinner, 101 W. Va. 632, 133 S. E. 371, the court, on a similar objection, stated as follows:

"In answer to the questions of the jury the court earlier defined the punishment following the several verdicts of guilty under the indictment. The accused and his counsel were present, and the questions and answers were taken down by the court reporter. The

correctness of the court's answers is not attacked, but error is alleged because such answers were not reduced to writing. These answers had no bearing whatsoever on the evidence or the law applicable to the evidence. We therefore hold that such answers were not in violation of Section 22, Ch. 131, Code" (relating to written instructions).

In the case of State v. Kennedy, 82 Mont. 165, 266 Pac. 386, the jury, after having deliberated for some time, returned into court to obtain some information, and wanted to know what was meant by the use of the words "two years to five years" in the instructions of the court with reference to the penalty for the offense charged, whereupon, in open court, the judge replied that it meant that the person must be confined in the state prison for not less than two nor more than five years. Continuing, he said:

"It is what we call in law the indeterminate sentence. Formerly the sentence was fixed, but for many years we have what is known as the indeterminate sentence, the court fixing the minimum and the maximum, and the minimum must not be more than one-half the maximum. Now, that is the meaning of that provision. The time that a man found guilty must actually serve is in the hands of the governor and the State Board of Pardons, as I understand. The court does not fix the actual time at all, but the minimum and maximum."

The objection was made in that case as in this: that these statements of the court should have been reduced to writing. But the court overruled the objection and held that no error was committed.

The main purpose for which statutes relating to written instructions have been enacted is stated in Rising Sun etc. Co. v. Conway, 7 Ind. 187, as follows:

"The evil to be remedied was the difficulty, severely felt by the bar, of getting a bill of exceptions which would fully embody the faulty charge. The act should

therefore receive such a beneficial construction as should effect the object designed."

Justice Brewer, subsequently a member of the Supreme Court of the United States, stated in State v. Potter, 15 Kans. 302, 320, as follows:

"It may be remarked * * * that the purpose of this statute is to secure to the defendant the exact rulings of the court in order that he may avail himself of any error in those rulings; for it was not intended to cast any unnecessary burden upon the court, nor to hamper or restrict communications between the court and jury; that it should be construed as fairly to secure that purpose, and not made a mere weapon of technical error; that in reference to answers to questions, as there is nothing to require the questions to be reduced to writing before they are put, it would seem trifling to compel the answer to be so reduced when the answer is simply responsive and depends for its meaning upon the unwritten question. It seems to us that, tested by this rule, the oral statement in this case must be held not a violation of the statute and not ground for reversal. Many words are used, but after all, it amounts to no more than a negative reply to the question asked."

So, too, in the case at bar, while many words were used, the reply of the court was in effect but an affirmative answer. The proceedings above mentioned, containing the statements of the court, were taken down in shorthand by the court reporter, were extended, and are now before us; accordingly, the main purpose above mentioned, for which the statute above quoted was passed, seems to have been fully subserved. Perhaps another purpose of the statute is to enable the jury to read the instructions given by the court, so as not to be compelled to rely on their recollection of the contents thereof. But they would not have been misled in the case at bar. Moreover, it is stated in 17 C. J. 353:

"Although there is some authority to the contrary, in most jurisdictions the giving of oral instructions contrary to a statute is not reversible error if the in-

structions are proper and do not injure accused. Especially is this true where the instructions were taken down by the official stenographer, or were reduced to writing immediately after they were given."

Whatever differences of opinion there may be among the courts, we think that what in the text just quoted is stated to be the majority rule should be applied in the case at bar, and that the instant contention should be overruled.

### 10. *Statements Referring to Board of Pardons.*

Section 32-201, Rev. St. 1931, provides that an accused found guilty of murder in the first degree shall suffer death, but that the jury may qualify their verdict by adding thereto "without capital punishment," and if so qualified, that the person convicted shall be sentenced to imprisonment for life. It is contended that the reference made in the statement of the trial judge above mentioned to the power of the Board of Pardons was highly prejudicial to the defendant; that it had a tendency to cause the jury to bring in a verdict of murder in the first degree without the above mentioned qualifying words, and that if such reference had not been made, the jury might have returned a verdict resulting in life imprisonment. We have examined all of the authorities cited to us by counsel, as well as others. Many of those cited by counsel for defendant have no application herein. For instance, he relies heavily upon Howell v. State, 102 O. S. 411, 131 N. E. 706. That case merely holds that the jury, in fixing the penalty for murder in the first degree under a statute similar to ours should fix it in view of the facts and circumstances shown by the evidence in the case. It has no bearing upon the question before us, as will be clearly seen by the cases from Ohio which will be considered presently. Again he relies upon State v.

Dooley, (Iowa) 57 N. W. 414, which holds that it is not error for the trial court to refuse to instruct the jury in regard to the law of pardons applicable to persons convicted of murder in the first degree. We think that the holding is correct. But that is a proposition altogether different from that which confronts us here. The cases cited by counsel which have a bearing herein will be referred to presently.

In determining the point before us, we should take into consideration, we think, cases in which the prosecuting attorney has made reference to the clemency which may be extended, after conviction, to one sentenced to life imprisonment. Such statements have an effect similar to statements on the same subject by the trial judge. They call attention to the same ultimate end. Statements by counsel to the following or similar effect have been considered by the courts: "Gentlemen of the jury, it is a matter of common knowledge that a sentence to the penitentiary for life only means eight years; and if you give the defendant a life sentence, he will be back home in eight years and will be at the end of that time ready to shoot some other man." Such statements involve an appeal (an appeal wholly absent from the statement made by the trial judge in the case at bar), to inflict the sentence of death because of the possible or probable reduction in the sentence by another department of the government. Courts have in most, though not in all, instances held such statements to be improper, but have also generally, and with but few exceptions, held them not to be sufficient ground for the reversal of a case. Underwood v. Commonwealth, (Ky.) 99 S. W. (2d) 467, and other Kentucky cases cited; People v. Murphy, 276 Ill. 304, 114 N. E. 609; State v. Junkins, 147 Ia. 588, 126 N. W. 689; Wechter v. People, 53 Colo. 89, 124 Pac. 183; Hillon v. People, 59 Colo. 280, 149 Pac. 250; Jacobs v. State,

103 Miss. 622, 60 So. 723; State v. Stratton, 170 Wash. 666, 17 P. (2d) 621. In the case of Sullivan v. State, (Ariz.) 55 P. (2d) 312, 318, the court stated:

"The other alleged objectionable argument is that the county attorney referred to the fact, so well known among all intelligent citizens that it would almost seem judicial notice might be taken thereof, that the average 'life' sentence is terminated in a few years by a parole or a pardon, and urged as one of the reasons why such a sentence should not be assessed that the defendant would be released with an opportunity of repeating his crime. Similar arguments were made by the prosecuting attorneys in the cases of (citing them), and held not to constitute reversible error. Under the law of Arizona, in the first degree murder cases, the jury fixes the penalty at either death or life imprisonment, in its discretion. The statute does not prescribe what jurors shall or shall not consider in the exercise of this discretion. We think that the probability of a defendant, whose punishment has been fixed by a jury at life imprisonment, actually having to serve the penalty so fixed, is one of the questions which it is highly proper for a jury to consider in the exercise of its discretion, and as was said in the case of Frady v. People, supra (40 P. (2d) 606) under somewhat similar circumstances: 'It was a statement of fact, known to all men, doubtless present in the minds of the jurors without being mentioned.' We are of the opinion that the remark objected to, under the circumstances of this case, was not such error as to require reversal thereof."

In Frady v. People, 96 Colo. 43, 40 P. (2d) 606, 608, 96 A. L. R. 1052, counsel for the people in his closing argument said: "While we are not asking at your hands the death penalty in this case, you are aware from the reading of our daily press that life sentences are often not sentences for life and that frequently one sentenced for life is at liberty in a few years." The court said:

"Objection was made thereto and error is assigned thereon. It does not appear that any ruling of the court was asked or given, and there was no request for a direction to disregard the statement. It was a state-

ment of fact, known to all men, doubtless present in the minds of the jurors without being mentioned, and most likely to creep into argument under the circumstances. Probably technically improper it was still within the court's discretion."

In the case of Glenday v. Commonwealth, 255 Ky. 313, the court considered such a statement of counsel, treating it as having the same effect as a statement by the court. It refers to a former case which had been reversed on account of a similar statement made by counsel, but says in that connection:

"Furthermore, the cases in which a reversal was ordered because of such remarks and the reason why they are regarded as improper are more or less bottomed upon the theory that counsel in making them informs the jury of something that its members possibly did not know, and which theory in this day of advanced enlightenment, wherein those now eligible for jury service have had opportunities to become enlightened and informed, is wholly unfounded, we are inclined to the conclusion that possibly greater effect has been given to such remarks, in some of the cases, than what the appellant was entitled to."

Turning now to the cases which deal with statements made by the court, it appears in Postell v. Commonwealth, (Ky.) 192 S. W. 39, that the jury, having deliberated for some time, came into court and asked if a prisoner under a life sentence was subject to a parole from the Board of Prison Commissioners. The court gave an affirmative answer. The jury retired to its room and afterward returned the death verdict. It was held by the Court of Appeals that if this occurred it was error, because the jury's verdict should not be influenced by what another department of the state government might or might not do. The point, however, was not before the court, since nothing in connection therewith was contained in the bill of exceptions, and the court mentioned the matter only for the guid-

ance of the trial courts in the future. The holding of the court, above quoted, in Glenday v. Commonwealth, supra, considerably weakened the statement in Postell v. Commonwealth, supra. In Coward v. Commonwealth, 164 Va. 639, 178 S. E. 797, the jury came into court and asked what time the defendant would get off while he was confined in jail, and the court told them. It was held that the power of the Governor to pardon should not be commented upon in argument, and that the trial court should have told the jury that the good time given a prisoner was no concern of theirs. The case was reversed for failure to do so. A number of cases on the subject are reviewed. Strangely enough, while it was said that it is error for the court in its instructions or for counsel in argument to tell the jury that its sentence, imposed and confirmed, might be set aside, it is also said that such instruction or argument is harmless in murder cases when the sentence is death. This conclusion of the court was arrived at apparently upon the theory that nothing should be stated in the case which would give the jury to understand that they might shirk their duty, and that when they have brought in a verdict carrying the death sentence, they have not done so. The case of Bean v. State, (Okl.) 54 P. (2d) 675, proceeds upon a different theory. In that case the court voluntarily instructed the jury on the provisions of the law relating to commutations of time for good behaviour. That was held error, on the ground that the instruction might have induced the jury to impose a greater punishment on the defendant than it would otherwise have done. The judgment of imprisonment for fifteen years was accordingly reduced to seven years. In Bryant v. State, 205 Ind. 372, 186 N. E. 322, the court instructed the jury at some length upon the right of the court to suspend the sentence in case of a verdict of guilty, and that in the

event they found the defendant guilty, he would not necessarily be punished; that they might safely trust to the court the right performance of whatever duty and responsibility was imposed upon that officer. It was held that the instruction was error and that it might lure and wheedle the jury past the obstacle of, and to disarm the jurors of, any doubts or hesitancy occasioned by the severity of the penalty involved.

In the case of People v. Sukdol, 322 Ill. 540, 153 N. E. 727, it was held that a voluntary instruction by the court on the parole system of the state was error, but not one for which a case would be reversed. In Liska v. State, 115 Oh. St. 283, 152 N. E. 667, the jury, after having been out twenty-four hours, came into court and asked the trial judge to inform them, if there were any hopes of pardon in case a verdict of murder in the first degree were brought in. The court said upon that subject:

"The trial judge told the jury the pardon board could not recommend a pardon for one convicted of murder in the first degree, except on evidence showing innocence beyond a reasonable doubt, and then also said to the jury that the Governor could pardon, if so disposed, at any time. Counsel for Liska insists that 'this was prejudicial error of the most glaring kind.' We cannot agree with counsel on this. The recommendation of mercy rests wholly in the sound discretion of the jury. They may extend or withhold as they see fit. The trial court might have declined to answer the question asked by the jury, but he did answer, and then told the jury it was not an issue in the case, and that it was not a thing for the jury to speculate upon."

In Massa v. State, 37 Ohio App. 532, 175 N. E. 219, the trial court instructed the jury that they had the right, under the statute, to transform the penalty of death to life imprisonment by recommending mercy, but added that "this provision does not take away from the Governor of the state his constitutional power to

pardon." Error was claimed by reason of this addition. The court, overruling the objection, stated:

"It is contended by counsel for plaintiffs in error that by so charging the trial court lodged within the minds of the jurors the thought or idea that if mercy was extended the Governor of the State might some day pardon the plaintiffs in error, and that in order to prevent such happenings the jurors, although they might have felt differently had they not been so instructed, refused to recommend mercy. This contention is without merit; all that the trial court did was to charge the law. Furthermore, by the overwhelming weight of the evidence the plaintiffs in error planned a robbery, and, while attempting to consummate it, shot down Ralph Wilcox at a time when he was lawfully defending himself and his master's property. Obviously Massa, McCartney, and Sites did not show Wilcox any mercy, and after a most careful reading of the records in these cases we fail to find any evidence therein tending to show any reason why the jurors should have recommended mercy for them."

In the case of State v. Rombolo, 89 N. J. L. 565, 99 Atl. 434, it appears that the jury, after having deliberated for some hours, came into court and asked a question similar to that in the case at bar, namely, whether a man sentenced to life imprisonment could be pardoned. The trial judge answered in the affirmative. The Court of Errors and Appeals, discussing the assignment of error in that connection, stated as follows:

"The judicial declaration which is now complained of was in answer to this question. No objection was made, or exception taken, to this deliverance, and therefore no assignment of error, or reason for reversal could, properly, be based upon it. But, as the matter is one of general importance in view of the legislation referred to by the trial court, it seems to us advisable that we should express our opinion concerning it. Prior to the enactment of this statute, the jury in a homicide case had no function to perform, except the ascertainment and declaration of the guilt or innocence of the defendant, and, in case he was found guilty, to declare the degree of his crime. The punishment

which should follow the conviction was a matter with which the jury had nothing to do. By the force of this legislation, however, an additional burden is put upon the jury, in case they shall adjudge the defendant to be guilty of murder in the first degree, and that is to determine, within the limits fixed by the statute, what his punishment shall be. Naturally one of the elements to be considered by them in determining that punishment is whether, if they shall by their verdict impose life imprisonment, it can be disregarded and set at naught by the court of pardons. We see no reason why they should not be informed of the power of the court of pardons if they so desire, and, as a necessary consequence, we see no impropriety in the trial court, either at the request of the jury, or without such request, apprising that body with relation to the power of supervision possessed by the pardoning tribunal."

In the case of State v. Carrigan, 93 N. J. L. 268, 108 Atl. 316, the trial court voluntarily instructed the jury that one of the elements to be considered by them in determining the punishment should be that a person sentenced to life imprisonment might, after serving not less than 15 years, be released on parole. It was held that no error was committed by such instruction, though it would have a tendency to influence the jury in determining whether or not to recommend life imprisonment instead of a sentence of death. A similar instruction in State v. Martin, 94 N. J. L. 139, 109 Atl. 350, was held to be "unfortunate," but not a ground for reversal. In State v. Schilling, 95 N. J. L. 145, 112 Atl. 400, the court said in connection with a similar instruction that "the power of the jury to commute the sentence of imprisonment for life is statutory and not evidence, and the power of the court of pardons is a constitutional one of common knowledge, and its (the court's) statement to the jury was of a sound legal proposition not harmful to the defendant, nor error in law, when, as in this case, it was applied to any verdict the jury might return." In the case of

State v. Mosley, 102 N. J. L. 94, 131 Atl. 297, the court, voluntarily, embodied in its instructions the following:

"Naturally, one of the elements to be considered by you, in determining that punishment, is whether, if you shall by your verdict impose life imprisonment, it can be disregarded and set at naught by the court of pardons, and also that provision of the statute which provides that every convicted prisoner confined in the State prison for the term of his natural life, whose record of conduct shows that he had observed the rules of the institution and who has served not less than fifteen years, may be released on parole, plus good time off."

This instruction was upheld, though by a divided court.

In the case of State v. Barth, 114 N. J. L. 112, 176 Atl. 182, proceedings were had similar to those in the case at bar. The jury wanted to know whether life imprisonment really meant life imprisonment; whether it could be modified by any authority. The trial court told them that the court of pardons had power to modify, change, reduce or set aside any sentence which the jury might impose. It was held that this was no error, in accordance with the previous decisions on the subject.

We need not analyze the cases further. By the clear weight of authority, information given to the jury in reference to clemency which might be extended after verdict is at least ordinarily held not to be so prejudicial as to be a sufficient ground for the reversal of a case. It is not necessary for us to go as far in our holding as some of the cases, and we are not inclined to go as far. The statute gives the jury the right to fix the penalty in cases like that at bar. That right should be left as untrammeled as possible. The trial court should not in any way attempt to influence the jury in bringing in a verdict either increasing or decreasing the penalty which might otherwise be inflicted. That

has often been held. See, for example, People v. Smith, 206 Cal. 235, 273 Pac. 789, 790; Pittman v. State, 84 Ark. 292, 105 S. W. 874; Bird v. State, 154 Ark. 297, 242 S. W. 71, 72. That is the principle upon which Coward v. Commonwealth, supra; Bean v. State, supra; Brown v. State, supra, were decided. A voluntary statement on the part of the trial court referring to the power of the Board of Pardons, or to the pardoning power of the Governor, might make the jury believe that the statement has been made for the express purpose of calling such power to their attention and thus might have a tendency to influence them in their verdict. Such voluntary statement should, accordingly, not be made, although, as already shown, some of the cases do not find it objectionable. We are not, however, able to perceive how any good purpose can be subserved by refusing to answer an inquiry of the jury. It would leave them in confusion and doubt, which would just as likely react against the accused as in his favor. We find that at least in some cases courts, in passing upon the point whether or not the trial judge should have made a statement to the jury, have pointed out that it was made in response to an inquiry, evidently deeming that of some importance. Freeman v. State, 156 Ark. 592; Jones v. State, 161 Ark. 242. While the jury may not know the details of reprieves, pardons and paroles, they, along with all ordinarily informed men, have a general knowledge of the subject. In Gaines v. Commonwealth, (Ky.) 46 S. W. (2d) 76, the jury wanted to know as to whether or not a life sentence could be reduced. The judge refused to give the information. They promptly returned a verdict carrying the death penalty. That, on account of the general knowledge above mentioned, would not unlikely be the verdict in other cases under the same circumstances, particularly in cases where the evidence is clear. It is argued that the court should have given

fuller information; that they should have been told that the defendant could obtain a reprieve even from a death sentence. That in fact was part of the argument made in the dissenting opinion in State v. Mosley, supra. We cannot see the force of the argument. If the jury had been given that information, they would have had even less hesitancy in returning the verdict carrying the penalty of death. Furthermore, the trial judge informed the jury that the power of the board extends to life sentences *as well as to sentences in other cases,* thus embracing sentences of death. The information given by the court, while strictly speaking correct, considered standing by itself, doubtless conveyed to the jury the thought that the Board of Pardons has the power to reduce sentences. That is not true. It has but power to recommend. The ultimate power rests with the Governor. But we do not think that fuller explanation would have had a different result. The jury were not misled. It is apparent that they did not want the defendant to receive the benefit of any reduction of a life sentence, no matter from what source it might come. The statement made by the trial judge was not voluntary; it was made merely in response to an inquiry of the jury. It was fair, extremely limited in scope, not indicating or suggesting in the least what the jury should or should not do. The ultimate power still rested with them. They were sworn to try the case according to the law and the evidence in the case. We cannot say that they failed to fully perform their duty. It is the merest speculation whether or not they might have returned a different verdict. We have no reason to believe that they would have done so, even if the court had told them, as the court did in Liska v. State, supra, that they should not speculate on what the Board of Pardons might do, although our anxiety to extend to an accused in a capital case the fullest measure of legal protection would have been more com-

pletely allayed if such instruction had been given. Reluctant, therefore, and hesitant as we are to affirm a verdict which takes the life of a human being, we find nothing in the record of the case which would justify us in disturbing it. We think the defendant had a fair and impartial trial, and that the judgment should be affirmed. It is so ordered. We should, however, perhaps add, in order that the trial judges may know what they should do in the future in similar cases, that, upon inquiry made as in this case, and which is answered fairly and without suggestion of what penalty should be imposed, they should tell the jury that they should not speculate upon what might happen after the verdict, so that no possible ground may be left for a claim that the fullest measure of protection has not been extended to the accused, even though such instruction may not turn out more effective in defendant's favor than it did in Liska v. State, supra.

And now this court appoints Friday, the 13th day of August, 1937, for the execution of the sentence pronounced in the court below.

*Affirmed.*

RINER, J., concurs.

KIMBALL, Justice.

I agree with the other members of the court in the conclusions stated in the foregoing opinion on questions relating to the trial of the issue of defendant's guilt or innocence.

I am of opinion, however, that there was error that may have prejudiced defendant on the question of punishment. The point is raised on the record by defendant's objection to the court's answer to the jury's inquiry in regard to the possibility of a life sentence being affected by pardon or commutation. I agree that it was proper for the court to answer the inquiry, and that the defendant was not prejudiced by the fact that the answer was not in writing.

But I think the court should have gone further. All sentences imposed by courts are subject to the constitutional pardoning power of the Governor. The sentence should be what the sentencing power believes will be a sufficient punishment for the crime and should not be influenced by the fact that the executive power may pardon the prisoner or commute the sentence.

When the jury in this case made the inquiry in question, it suggested the probability that they, or some of them, thought life imprisonment a sufficient punishment, but were confronted by the argument that a sentence carrying that penalty might soon be commuted, and therefore an unqualified verdict that would carry the death penalty should be returned. I think the jury should have been told that they should return the verdict that would carry the punishment they thought the defendant should suffer, and that they should not speculate upon what might happen after the verdict. My associates agree that this caution should be given under like circumstances in future cases. Can it be said that the failure to give it in this case was not prejudicial to defendant? I might answer this question in the affirmative if it were clear that there were no other errors that could have affected the jury's decision on the question of the punishment.

In acting on the jury's inquiry the court's answer went further than the question required, and gave the erroneous impression that pardons are granted by the Board of Pardons. The Board, as stated in the majority opinion, has no such power. Pardons are granted by the Governor. The Board merely investigates and recommends. I do not dwell on this inaccuracy. It probably was harmless. But I think information desired by the jury for consideration on a question of life or death should be correct.

Of much more importance is the instruction on the

subject of the punishment. The jury by written instruction were told:

"Under the laws of the state, a person who is found guilty of murder in the first degree shall suffer death or be imprisoned in the penitentiary at hard labor for life, in the discretion of the jury trying the case. Therefore, in this case, if you find from the evidence, beyond a reasonable doubt, that the defendant is guilty of murder in the first degree, it will then be your duty to determine the penalty which he shall suffer. However, you will not arbitrarily fix the penalty at either death or at imprisonment for life at hard labor in the State Penitentiary, but in that case it will be your duty to carefully weigh and consider all of the evidence, for the purpose of determining matters which aggravate or mitigate the offense, and you will fix the punishment at death or hard labor for life in the penitentiary according to the circumstances in aggravation or mitigation of the offense as shown by the evidence. If you find the defendant guilty of murder in the first degree and determine that he shall suffer the death penalty, then it will be your duty to return a verdict finding the defendant guilty of murder in the first degree and without qualifying words. If, however, you find that he should suffer imprisonment in the penitentiary at hard labor for life, it will be your duty to find him guilty of murder in the first degree, but insert in your verdict the words 'without capital punishment.' "

In 1915 our statute prescribing the death penalty for murder in the first degree was amended by providing that "the jury may qualify their verdict by adding thereto 'without capital punishment' and whenever the jury shall return a verdict qualified as aforesaid, the person convicted shall be sentenced to imprisonment, at hard labor, for life." R. S. 1931, § 32-201. The quoted language of the amendment appears to have been copied word for word from the act of Congress of January 15, 1897 (29 Stat. at L. 456) considered by the Supreme Court of the United States in Winston v. United States (and two other cases) 172 U. S. 303. In each of those cases the instructions of the judge

"clearly gave the jury to understand that the act of Congress did not intend or authorize the jury to qualify their verdict by the addition of the words 'without capital punishment,' unless mitigating or palliating circumstances were proved," and the judgments on unqualified verdicts were reversed because the "instructions were erroneous in matter of law, as undertaking to control the discretionary power vested by Congress in the jury, and as attributing to Congress an intention unwarranted either by the express words or by the apparent purpose of the statute." In the course of its opinion the Supreme Court said:

"The right to qualify a verdict of guilty, by adding the words 'without capital punishment,' is thus conferred upon the jury in all cases of murder. The act does not itself prescribe, nor authorize the court to prescribe, any rule defining or circumscribing the exercise of this right; but commits the whole matter of its exercise to the judgment and the consciences of the jury. The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court, or the jury, is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment. How far considerations of age, sex, ignorance, illness or intoxication, of human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act of Congress to the sound discretion of the jury, and of the jury alone."

It seems to me that the language quoted above from the Winston decision is so clearly applicable to our similar statute and to the instruction given in the case at bar, that I shall not attempt to add anything to it.

Further discussion of the subject may be found in the following later cases: Cohen v. State, 116 Ga. 573, 42 S. E. 781; State v. Thorne, 39 Utah 208, 117 Pac. 58; State v. Peltier, 21 N. D. 188, 129 N. W. 451; State v. Martin, 92 N. J. L. 436, 106 Atl. 385, 17 A. L. R. 1090; People v. Bollinger, 196 Calif. 191, 237 Pac. 25; Hermandez v. State, 43 Ariz. 424, 32 P. (2d) 18.

There has been no objection, either in the trial court or here, to the written instruction on the subject of punishment. But I think the instruction may be noticed. If it had the effect of circumscribing the exercise by the jury of their discretionary power to fix the punishment, the error was probably what we have called "fundamental error" that may be considered without exception or assignment of error. See Parker v. State, 24 Wyo. 491, 499, 161 Pac. 552. The error of course would affect only the punishment, and probably the verdict in so far as it finds defendant guilty of first degree murder should stand, and a new trial had on the question of punishment only. See State v. Sorrentino, 31 Wyo. 129, 224 Pac. 420.