[Crim. No. 21352. Nov. 1, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCELINO RAMOS, Defendant and Appellant.

138

**COUNSEL**

Alan M. Caplan, under appointment by the Supreme Court, Bushnell, Caplan, Fielding & Rudy, Quin Denvir, State Public Defender, Ezra

Hendon, Alice V. Collins and Diane M. Griffiths, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian and Steve White, Chief Assistant Attorneys General, Daniel J. Kremer and Hanley D. Mayfield, Assistant Attorneys General, Richard D. Garske, Patricia D. Benke, Michael D. Wellington, Jay M. Bloom and Harley D. Mayfield, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, J.**—This case is before us on remand from the United States Supreme Court. When it was last here, we concluded that no reversible error had occurred at the guilt phase of defendant's trial, but that an instruction given at the penalty phase—the so-called Briggs Instruction, described below—violated the federal Constitution and required a reversal of the penalty judgment and a remand for further proceedings. (*People* v. *Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908] [*Ramos I*].) In light of our ruling on the Briggs Instruction, we did not reach other claims of error raised by defendant. The United States Supreme Court granted certiorari to review our decision, and ultimately concluded, in a five to four holding, that the Briggs Instruction *did not violate the federal Constitution.* (*California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].) Recognizing that its resolution of the single federal constitutional issue before it left a variety of issues still to be determined by this court, the high court remanded the matter to us "for further proceedings not inconsistent with [its] opinion." (463 U.S. at p. 1014 [77 L.Ed.2d at p. 1189, 103 S.Ct. at p. 3460].) We granted the parties leave to file supplemental briefs and set the case for reargument.

Defendant initially contends that under this court's recent decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], a remand for a new determination of both special circumstances and penalty is required. He points out that at trial his counsel explicitly requested a ruling that the People had the burden of proving an intentional killing as an element of the felony-murder special circumstance with which he was charged; the trial court denied the request, interpreting the statute as omitting any such intent-to-kill requirement. Although the Attorney General acknowledges that the trial court erred in light of our holding in *Carlos,* he seeks to avoid a reversal and remand on several theories. As we shall explain, however, we conclude that under the principles established in *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], retrial

of the special circumstance and penalty phases, before a properly instructed jury, is required.

In light of this conclusion, we need address only one additional issue on which we believe guidance should be provided for retrial: the question of the validity of the Briggs Instruction under the *state* Constitution. For the reasons discussed below, we conclude that, considered in light of longstanding California principles and authorities, the Briggs Instruction is incompatible with state constitutional doctrine and that juries should not be instructed pursuant to its terms.

I

The facts of the case are set forth in *Ramos I.* (30 Cal.3d at pp. 563-566.) We briefly review only those relevant to the issues now before us.

Kevin Pickrell, one of the victims of the offenses in question, was the prosecution's principal witness at trial. He testified that in the early morning hours of June 3, 1979, he and Kathryn Parrott were working at a Taco Bell restaurant in Santa Ana, California. Just before the restaurant's closing time, a customer, later identified as codefendant Ruben Gaitan, entered and placed an order. While the order was being filled, defendant Ramos entered. Pickrell recognized defendant because he was employed at that time as a janitor at the Taco Bell. Defendant asked to check his work schedule and Pickrell permitted him to enter the work area in the rear of the store.

Within a minute or two defendant emerged from the back with a rifle partially covered by a coat. Pickrell thought it was some sort of joke and began laughing, but defendant told him he was not kidding. He directed Gaitan to hop over the counter, and ordered Pickrell and Parrott to enter the restaurant's walk-in refrigerator at the rear of the store and to face the back wall. Pickrell testified that defendant acted in a manner unlike any time he had seen him in the past, almost as though he did not recognize Pickrell or Parrott; Pickrell suspected that defendant might have been under the influence of a drug.

While Parrott and Pickrell remained in the refrigerator, defendant left and entered the refrigerator several times, asking about the keys to the restaurant safe and telling them to keep quiet. He then directed Parrott and Pickrell—who were still facing the rear wall—to kneel on the floor, remove their hats and say their prayers. He also told Parrott to place a rag in her mouth.

Pickrell testified that the next thing he remembered was hearing a dull "thud" and feeling Parrott fall toward him. Almost simultaneously, he felt

a sharp blow to the back of his head and fell forward. Sometime thereafter, he felt another blow to his head followed by a ringing in his ears; he testified, however, that he never heard a gunshot, nor smelled smoke.

When he heard no movement in the building, Pickrell got up and called the police. On their arrival, they found that Parrott was dead. Later medical examination revealed that she had two lacerations on the back of her head, apparently caused by a blow from a blunt, heavy object at or near the time of death, and that she had died of a gunshot wound to the head. A medical examination of Pickrell disclosed similar lacerations on the back of his head and a piece of tissue missing from his right ear which could have been caused by a glancing gunshot.

On the basis of Pickrell's identification, defendant and Gaitan were arrested that same day. The police obtained a search warrant for their apartment and found additional evidence tying them to the robbery.

At the conclusion of the prosecution's case—and outside the presence of the jury—defense counsel requested a ruling from the court on the elements of the felony-murder special circumstance with which defendant was charged. Counsel took the position that in order to establish the special circumstance the People were required to prove both that the killing occurred during the commission of a robbery and that the killing was intentional. The trial court rejected the argument and ruled that the special circumstance could be established under the felony-murder doctrine, in which an intent to kill is not a required element.

Defense counsel then set forth an offer of proof for the record. He stated: "For the record, Mr. Ramos' defense would have been that he did indeed commit the robbery and he did indeed perpetrate this crime, but he did not intend to kill either one of the victims, and that the fact that Miss [Parrott] died was an accident. . . . In view of the court's ruling that that's not a defense, Mr. Ramos will offer no defense."

True to counsel's word, defendant presented no evidence at the guilt/special circumstance phase. On this state of the evidence, the jury found defendant guilty on all counts and also found true the charged special circumstance.

At the penalty phase, the defense presented considerable evidence of defendant's childhood and background, disclosing that he and his brother were adopted as infants, but his adoptive father died when he was 8 and his adoptive mother when he was 13 or 14. From that time on he lived alone with his older brother, stopped attending school and church regularly and

began associating with a "bad" element, including codefendant Gaitan—his closest friend.

A psychiatrist and a psychologist who had interviewed and conducted several tests on defendant testified on his behalf. Their testing revealed that defendant had congenital brain damage, had a full scale IQ of 75—putting him in the "borderline retardation" category—and was "borderline schizophrenic."

In addition, defendant testified on his own behalf. He admitted committing the robbery and shooting Parrott and Pickrell, but expressly denied intending to kill them. He explained that at first he simply hit each of the victims on the head with a metal pipe and left them unconscious in the refrigerator. When he came into the front part of the store, however, Gaitan told him that the two must be killed to prevent them from identifying him or Gaitan. He then reentered the refrigerator, intending only to make it look as though he had killed the two victims if Gaitan came in to check: "I said to myself: In order for [Gaitan] to think that I would kill them, I'll make it look like—in case he decides to come in and check, you know. So then I walked towards them. I stood a foot away from each person. I pointed the gun slightly upward at an angled position to graze them or something, because I never shot a weapon at that close a range before . . . My intentions were not to kill them; my intentions were to just graze them, kind of knock them out . . . I pointed the weapon at an angled position, like upwards, to sort of graze them, and I fired the shot . . . After I shot, I turned around and I looked at Mr. Pickrell, Kevin, and I went back in back of him about a foot away, and I fired an angle position at him, too."

Finally, the defense established that this incident was defendant's first involvement with the law, that he had no prior convictions or even arrests, no history of violence in any other setting, and that defendant was only 21 years old at the time of the offenses.

After about three hours of deliberation, the jury returned a verdict of death.

## II

As noted, defendant's initial contention is that a reversal of the special circumstance finding and penalty judgment is required under our decision in *Carlos,* where we concluded—contrary to the trial court's ruling in this case—that an intentional killing is a required element of the "felony-murder" special circumstance set forth in section 190.2, subdivision (a)(17).

■ The Attorney General first argues that we need not reach the substantive merits of this claim because defendant is precluded from raising this issue by virtue of the law of the case doctrine. (See generally *People v. Shuey* (1975) 13 Cal.3d 835, 840-848 [120 Cal.Rptr. 83, 533 P.2d 211].) He contends that because the dispositive order in *Ramos I* reversed only the penalty judgment and affirmed the judgment in all other respects (30 Cal.3d at p. 602), that decision necessarily upheld the special circumstance finding which defendant may not reopen at this time.

In *DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 178-180 [18 Cal.Rptr. 369, 367 P.2d 865], however, we explained that an exception to the law of the case doctrine "has . . . been applied to cases where the controlling rules of law have been altered or clarified by a decision intervening between the first and second determinations of the appellate courts. [Citation.]" (*Ibid.*) *Carlos* is, of course, just such a clarifying, intervening decision. Consequently, the law of the case doctrine is no bar to this claim.

■ On the merits, the Attorney General does not suggest that the trial court ruling is compatible with *Carlos*. Instead, he argues that reversal is not required either (1) because *Carlos'* interpretation of the special circumstance provision should not be applied to cases tried before the *Carlos* decision, or (2) because the error was not prejudicial. Under our recent holding in *Garcia,* neither contention has merit.

■ On the retroactivity point, *Garcia* makes clear that "[t]he *Carlos* holding should apply retroactively to all cases not yet final." (36 Cal.3d at p. 549.) Accordingly, *Carlos* is fully applicable here.

■ With respect to the question of prejudice, *Garcia* concludes after a detailed analysis of recent federal decisions "that the United States Supreme Court would find the error [in failing to instruct the jury on the requisite intent] reversible per se" (*id.,* at p. 554), subject only to a few, narrow exceptions. As set forth in *Garcia,* the only instances in which a failure to give a proper intent instruction under *Carlos* may not require reversal of a special circumstance finding are (1) " 'if the erroneous instruction was given in connection with an offense for which the defendant was acquitted and if the instruction had no bearing on the offense for which he was convicted,' " (36 Cal.3d at p. 554 [quoting *Connecticut* v. *Johnson* (1983) 460 U.S. 73, at p. 87 (74 L.Ed.2d 823, at p. 834, 103 S.Ct. 969, at p. 977)]), (2) " 'if the defendant conceded the issue of intent' " (36 Cal.3d at p. 554 [quoting *Connecticut* v. *Johnson, supra,* 460 U.S. at p. 87 (74 L.Ed.2d at p. 834, 103 S.Ct. at p. 978)]), (3) if " 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions' " (36 Cal.3d at pp. 554-555 [quoting *People* v.

*Sedeno* (1974) 10 Cal.3d 703, 721 (112 Cal.Rptr. 1, 518 P.2d 913)]), or (4) under limited circumstances, if "the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration." (36 Cal.3d at p. 556 [relying on standard drawn from *People* v. *Cantrell* (1973) 8 Cal.3d 672, 685 (105 Cal.Rptr. 792, 504 P.2d 1256) and *People* v. *Thornton* (1974) 11 Cal.3d 738 (114 Cal.Rptr. 467, 523 P.2d 267)].)

In discussing this last exception—which has its source in the *Cantrell* and *Thornton* cases—*Garcia* explains: "In many cases it will be difficult to apply the *Cantrell-Thornton* analysis to *Carlos* error. If the defendant in a pre-*Carlos* trial was unaware that intent to kill was an element of the felony-murder special circumstance, he might through ignorance fail to present evidence worthy of consideration on that matter. We could not in such cases affirm a special circumstance finding on the ground that defendant did not introduce evidence sufficient to raise a material issue. But there may also be cases where the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration.[1] In such a case the reasoning of *Cantrell* and *Thornton* may avoid a meaningless retrial." (36 Cal.3d at p. 556.) *Garcia* goes on to note, however, that because it is not clear that the *Cantrell-Thornton* exception will be approved by the federal high court, "pending further guidance from the United States Supreme Court, we will apply the reasoning of *Cantrell* and *Thornton* only to those cases clearly falling within the ambit of that reasoning so as not to detract substantially from the per se character of the high court's rule." (*Ibid.*)

 Under *Garcia*'s standards, reversal is required in this case. To begin with, it is clear that none of the first three exceptions is applicable here. As in *Garcia*, "[t]he omitted instruction on intent related to the special circumstance found to be true, not to some crime or special circumstance of which defendant was acquitted," "[d]efendant did not concede intent," and "[t]he jury did not find that he intended to kill in connection with some other, proper instruction." (*Id.* at pp. 556-557.)[2]

---

[1]*Garcia* includes a footnote at this point which reads: "We note, for example, that the issue of intent may arise in connection with a prosecution attempt to prove first degree murder without reliance on the felony-murder rule, in connection with some special circumstance which expressly requires intent to kill, or at the penalty phase where lack of intent would be a mitigating factor." (36 Cal.3d at p. 556, fn. 12.)

[2]Although the Attorney General argues that, in light of defendant's conviction of attempted murder of Kevin Pickrell, the jury necessarily found an intent to kill, as we pointed out in *Ramos I,* the jury was improperly instructed on the attempted murder count and was never expressly told that the felony-murder doctrine was not applicable to attempted murder. (See 30 Cal.3d at pp. 583-584.)

In any event, even if the attempted-murder conviction could be construed as an implied finding that defendant intended to kill Pickrell, and even if that intent could be interpreted

That leaves only the fourth exception—*Cantrell-Thornton*. As noted above, with respect to this exception *Garcia* suggests that "there may . . . be cases where the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration." (36 Cal.3d at p. 556:) The Attorney General argues that the absence of an intent-to-kill instruction at the special circumstance phase should be found harmless under this exception based on the evidence on intent, or defendant's lack of such intent, that was presented at the penalty phase.

██ ██ This is not a case, however, in which we can properly find that the record "not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration," particularly in light of *Garcia*'s caveat that we will apply this exception "only to those cases *clearly falling within the ambit of that reasoning* so as not to detract substantially from the per se character of the high court's rule." (Italics added.) (*Ibid.*) As discussed above, defendant expressly testified at the penalty phase that when he shot Parrott and Pickrell, he did not intend to kill them but intended only to graze them, attempting to mislead his accomplice into believing they had been killed.[3] Although defendant's testimony was self-serving and implausible, the undeniable fact is that Pickrell—although shot at very close range—was in fact only grazed by the bullet. In addition, both the medical evidence of the lacerations suffered by the victims on the back of their heads, and Pickrell's testimony that he did not hear any gunshots or smell any smoke but simply felt a blow to his head, are consistent with defendant's testimony that he initially simply knocked the victims out with the metal pipe he was carrying and only later shot them at his accomplice's direction.

as applicable to Parrott as well (cf. *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 765 [175 Cal.Rptr. 738, 631 P.2d 446]), it would clearly be improper to apply the *Sedeno* exception on the basis of the attempted-murder conviction in this case. As discussed above, at the time the jury returned that verdict defendant had presented no evidence at all on the intentional killing issue, and his offer of proof demonstrates that his decision not to contest the intent issue at the guilt phase was based directly on the trial court's ruling that an absence of intent to kill would not avoid a finding that the special circumstance was true and, consequently, an ultimate penalty trial. Under these circumstances, the attempted-murder conviction cannot properly be found to reflect a reliable jury determination on the intent-to-kill issue so as to establish the harmlessness of the *Carlos* error. We would surely be guilty of bootstrapping if we were to base a finding of no prejudice on a jury determination that may have resulted from an evidentiary void precipitated by the very error in question.

[3] While the Attorney General argues that an intent to inflict serious bodily injury under circumstances posing a risk of death—i.e., the "implied malice" standard—ought to satisfy the intent-to-kill requirement of *Carlos,* that proposal is not compatible with *Carlos.* As applied in the special circumstance context, the intent-to-kill requirement elevates a first degree murder to a potential death penalty case; the implied-malice concept, by contrast, distinguishes involuntary manslaughter from second degree murder. Thus, intent to kill under *Carlos* means the specific intent to take another's life.

The jury was, of course, free to reject defendant's testimony and to find that he did, in fact, intend to kill both victims. Nonetheless, on this record the question of intent cannot be decided as a matter of law and defendant's evidence cannot be dismissed as "not worthy of consideration." Accordingly, reversal cannot be avoided under *Cantrell-Thornton.*

■ The Attorney General argues that even if the question of intent-to-kill cannot be decided as a matter of law, reversal is not warranted here because we can tell that the jury—after hearing defendant's evidence at the penalty phase—in fact determined that he did intend to kill. The Attorney General points to the fact that during closing argument at the penalty phase the prosecutor told the jury at one point that "[i]f you do not feel that this is an execution murder, you should not return the penalty of death." Since the jury did return a death sentence, the Attorney General reasons that it necessarily found an intent-to-kill.

There are several flaws in this reasoning. First, the jury was, of course, not bound to accept the prosecutor's suggestion and was free, under the court's instructions, to impose a death sentence without finding an intentional killing. Second, even assuming the jury chose to follow the quoted statement, there is nothing in that remark which told the jury that it had to find *beyond a reasonable doubt* that defendant intended to kill before it could return a death sentence; if the jury had been properly instructed at the special circumstance stage, it would have been told that the prosecution had to establish an intent-to-kill under that demanding standard of proof. Finally, although the prosecutor did make the above remark at one point in his closing argument, at other points he emphasized that under the applicable instructions of the 1978 law the jury was required to return a death sentence so long as it found that the aggravating factors present in the case outweighed the mitigating factors. Since, according to the prosecutor's argument, there were numerous aggravating factors in this case and only a few, much less significant mitigating factors, the jury could well have believed that it was required to return a death sentence because the totality of the aggravating factors "outweighed" the mitigating factors, without regard to whether the killing was intentional or not. Under these circumstances, we cannot find that the sentence which the jury returned establishes that it properly found an intent to kill under the applicable beyond-a-reasonable-doubt standard.[4]

---

[4]In declining to undertake a reexamination of the felony-murder doctrine in *Ramos I,* we remarked that the case was an "inappropriate vehicle" for such an effort because "[t]he

 Accordingly, we conclude that defendant is entitled to a reversal of the special circumstance finding and penalty judgment, and a remand for a new trial of the special circumstance phase before a jury that is properly instructed that in order to sustain the special circumstance finding the prosecution must prove, beyond a reasonable doubt, that defendant intended to kill the victim.

### III

In light of this conclusion, there is no need to address the bulk of the penalty phase issues raised by defendant. The parties have, however, extensively briefed the question of the validity of the Briggs Instruction under the California Constitution, and for guidance both at retrial and in other cases we believe that it is appropriate to resolve that issue at this time.

 Under California law, the trier of fact—the jury, unless it is waived—has the responsibility of fixing the defendant's sentence between two alternative punishments: death or confinement for life without possibility of parole. (§ 190.3.) In 1978, as part of an extensive revision of the death penalty statutes by initiative, a new paragraph—embodying what has come to be known as the Briggs Instruction—was added to section 190.3. The paragraph reads in full: "The trier of fact shall be instructed that a sentence of confinement to state prison for a term of life without the possibility of parole may in future after sentence is imposed, be commuted or modified to a sentence that includes the possibility of parole by the Governor of the State of California."

In *Ramos I,* we evaluated this instruction in light of federal constitutional principles that had been set forth in a number of recent United States Supreme Court death penalty decisions and concluded that the instruction was incompatible with the federal authorities in two separate respects. (30 Cal.3d at pp. 590-602.) First, we concluded that the instruction, by directing the jury's attention to the possibility of a future gubernatorial commutation, conflicted with a line of decisions which had established "that in capital cases the Eighth Amendment requires that the decision whether a

---

record in the guilt and penalty phases strongly suggests that the jury viewed the killing in this case as intentional and malicious." (30 Cal.3d at p. 590.) An accompanying footnote (30 Cal.3d at p. 590, fn. 17) makes it clear, however, that that observation was not intended as the equivalent of a determination that the jury had actually found that defendant intended to kill. In that footnote, we adverted to defendant's argument "that the 1978 death penalty law is unconstitutional because it allows for the imposition of capital punishment without a determination that the defendant intended the death of the victim where the first degree murder conviction is based on a felony-murder theory," and noted simply that "[i]n view of our conclusion that the penalty determination must be reversed due to the unconstitutionality of the Briggs Instruction, we need not express an opinion on this additional contention." (*Ibid.*) (See also 30 Cal.3d at p. 584 and fn. 13.)

defendant is to live or die must be based upon 'consideration of the character and record of the individual offender and the circumstances of the particular offense.'" (30 Cal.3d at pp. 595-596 [quoting *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304 (49 L.Ed.2d 944, 961, 96 S.Ct. 2978); *Lockett* v. *Ohio* (1978) 438 U.S. 586, 603-608 (57 L.Ed.2d 973, 988-992, 98 S.Ct. 2954)].) Second, we found that because the Briggs Instruction informed the jury that a sentence of life without possibility of parole may in the future be transformed into a sentence which includes the possibility of parole through the exercise of the gubernatorial commutation power, but did not tell the jury that a death sentence is also subject to the same gubernatorial prerogative, the instruction was misleading: it unconstitutionally "stacked the deck" against the defendant by suggesting to the jury that "the only way to be sure that the defendant is never again let loose upon society . . . is to impose a sentence of death." (30 Cal.3d at pp. 597-599 [citing *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 521-523 (20 L.Ed.2d 776, 785-786, 88 S.Ct. 1770); *Gardner* v. *Florida* (1977) 430 U.S. 349, 358 (51 L.Ed.2d 293, 402, 97 S.Ct. 1197)].)

The United States Supreme Court granted certiorari and, in a closely divided decision, disagreed with our conclusion that the Briggs Instruction conflicted with the principles enunciated in its earlier decisions. (*California* v. *Ramos, supra,* 463 U.S. 992.) In response to the claim that the instruction's focus on the gubernatorial commutation power improperly injected an irrelevant factor—a factor which did not relate to the character or background of the offender or the circumstances of the offense—into the capital sentencing process, the majority reasoned that the instruction actually invited the jury to consider the "future dangerousness" of the defendant rather than the actions of some future governor, and, relying heavily on its decision in *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950], held that such consideration was constitutionally permissible. The court also rejected the contention that the incomplete nature of the instruction—the omission of the fact that the death penalty, as well as life without possibility of parole, is subject to gubernatorial commutation—violated federal constitutional standards: it reasoned that advising the jury that a death sentence may also be commuted would not necessarily benefit a defendant because then the jurors—informed that their decision was not final—might "approach their sentencing decision with less appreciation for the gravity of their choice and for the moral responsibility reposed in them as sentencers." (463 U.S. at p. 1011 [77 L.Ed.2d at p. 1187, 103 S.Ct. at p. 3458].) Although the majority thus upheld the instruction against defendant's *federal* constitutional challenge, the court made clear that the validity of the Briggs Instruction under the *California* Constitution remained to be decided by this court on remand. (463 U.S. at p. 997 [77 L.Ed.2d at p. 1178, 103 S.Ct. at p. 3451, fn. 7].)

██ ██ It is to that issue that we now turn.[5] As the Attorney General acknowledges, "defendant's state constitutional . . . claim cannot be resolved by a mechanical invocation of current federal precedent." (*People* v. *Chavez* (1980) 26 Cal.3d 334, 352 [161 Cal.Rptr. 762, 605 P.2d 401].) As we explained in *Chavez*: "California decisions have long recognized that '[s]tate courts in interpreting provisions of the state Constitution are not necessarily concluded by an interpretation placed on similar provisions in the federal Constitution.' [Citations.] This conclusion, of course, simply reflects one of the principal tenets of our federal system of government: just as the United States Supreme Court bears the ultimate judicial responsibility for determining matters of federal law, this court bears the ultimate judicial responsibility for resolving questions of state law, including the proper interpretation of provisions of the state Constitution. [Citation.] ██ In fulfilling this difficult and grave responsibility, we cannot properly relegate our task to the judicial guardians of the federal Constitution, but instead must recognize our personal obligation to exercise independent legal judgment in ascertaining the meaning and application of state constitutional provisions." (*Ibid.*) (See also Cal. Const., art. I, § 24.)[6]

---

[5]In addition to challenging the instruction as violative of the state Constitution, defendant suggests that—despite the United States Supreme Court's ruling—we should again invalidate the instruction under federal due process principles. Defendant's argument rests on his contention that the holding in *California* v. *Ramos* was based on a misinterpretation of the relevant California death penalty statute, and that since this court is the final arbiter of the meaning of state statutes (see, e.g., *O'Brien* v. *Skinner* (1974) 414 U.S. 524, 531 [38 L.Ed.2d 702, 708, 94 S.Ct. 740]), we can correct the Supreme Court's statutory construction and then explain why the instruction violates federal due process principles under a proper interpretation of the California death penalty scheme.

Although we share defendant's doubts that the California death penalty provisions are as analogous to the Texas statutes approved in *Jurek* v. *Texas, supra,* as the majority in *California* v. *Ramos* suggested, we do not think that the Supreme Court's federal constitutional holding can be dismissed on the ground defendant proposes. As we understand its decision, the majority of the Supreme Court did not purport to "interpret" the California statute in a particular manner, but simply held that, for federal constitutional purposes, the statutory provision was similar enough to the Texas scheme to withstand a federal constitutional attack. The Supreme Court's resolution of that federal constitutional claim is, of course, binding on us. Thus, only the state constitutional issue is open for our determination.

[6]Our past cases clearly establish that article I, section 27 of the California Constitution—enacted by initiative in 1972—does not insulate the Briggs Instruction from state constitutional review. As we explained in *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797, 808 [183 Cal.Rptr. 800, 647 P.2d 76]: "The 1972 initiative was intended simply to cancel the holding of [*People* v. *Anderson* (1972) 6 Cal.3d 628 (100 Cal.Rptr. 152, 493 P.2d 880)], to clarify that *the penalty of death* does not violate any provision of the California Constitution . . . ." (Italics added.) As Justice Richardson stated in his lead opinion in *People* v. *Frierson* (1979) 25 Cal.3d 142, 186 [158 Cal.Rptr. 281, 599 P.2d 587]: "[P]roperly construed, section 27 validates the death penalty *as a permissible type of punishment* under the *California* Constitution." (First italics added.) Thus, in *Engert,* we held that "section 27 was not intended to insulate every potential capital case from the requirements of state constitutional due process." (31 Cal.3d at p. 809.) That conclusion is directly applicable here.

The California Constitution provides, in both article I, section 7 and article I, section 15, that a person may not "be deprived of life, liberty or property without due process of law." Although "due process" encompasses a broad range of safeguards, in essence the concept guarantees a fundamentally fair decision-making process. (See, e.g., *People* v. *Ramirez* (1979) 25 Cal.3d 260, 265-269 [158 Cal.Rptr. 316, 599 P.2d 622]; *People* v. *Superior Court* (*Greer*) (1977) 19 Cal.3d 255, 266 [137 Cal.Rptr. 476, 561 P.2d 1164].) As we shall explain, when viewed in relation to prior California decisions and to the overwhelming majority of related precedents in other states, the Briggs Instruction is incompatible with this guarantee of "fundamental fairness" both because it is seriously and prejudicially misleading and because it invites the jury to be influenced by speculative and improper considerations.

A

We begin with the misleading character of the instruction. Under the California Constitution, the Governor's power of commutation or pardon extends equally to a sentence of death and to a sentence of life without possibility of parole. (Cal. Const., art. V, § 8.)[7] The Briggs Instruction, however, informs the jury only that a sentence of life without possibility of parole may be commuted. Although the instruction is literally accurate as far as it goes, it is a classic example of a misleading "half-truth." Since the instruction is only given in a penalty trial—when the jury's attention is narrowly focused on two alternative punishments—the instruction would reasonably be understood by the average juror to mean, by negative implication, that while a sentence of life without possibility of parole may be commuted, a sentence of death may not. Viewed realistically and in context, the instruction provides the jury with seriously misleading information.

In *People* v. *Arbuckle* (1978) 22 Cal.3d 749, 754-755 [150 Cal.Rptr. 778, 587 P.2d 220, 3 A.L.R.4th 1171], we observed that the "[r]eliability of the information considered [at the sentencing stage] is the key issue in determining fundamental fairness." In a variety of instances, California cases have condemned prosecutorial arguments to the jury which contained misleading statements of law with respect to postconviction proceedings or the defendant's potential release. (See, e.g., *People* v. *Modesto* (1967) 66

---

[7]Article V, section 8, provides in full: "Subject to application procedures provided by statute, the Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation, after sentence, except in case of impeachment. The Governor shall report to the Legislature each reprieve, pardon, and commutation granted, stating the pertinent facts and the reasons for granting it. The Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring."

Cal.2d 695, 708-709 [59 Cal.Rptr. 124, 427 P.2d 788] [inaccurate statement that persons found not guilty by reason of insanity would be "turned loose"]; *People* v. *Linden* (1959) 52 Cal.2d 1, 26-27 [338 P.2d 397] [erroneous statement of the scope of this court's review on automatic appeal]; *People* v. *Caetano* (1947) 29 Cal.2d 616, 619-620 [177 P.2d 1] [suggestion that paroles are improvidently granted simply to provide space for incoming prisoners].) Because the Briggs Instruction embodies a comparable misstatement of law which the court itself must read to the jury to guide its penalty deliberations, we conclude that the instruction denies due process under the California Constitution.

The Attorney General attempts to defend the Briggs Instruction by arguing, on a number of different theories, that a defendant is in effect not prejudiced by the incomplete nature of the instruction. He suggests first that a jury that is concerned about a defendant's potential release through gubernatorial commutation would not be any less inclined to vote for the death penalty if it were informed that even a death sentence would not necessarily prevent such release. But the pernicious effect of the Briggs Instruction is that it may lead a jury that does not believe that the death penalty is necessary, but fears a future commutation, to return a death penalty in the mistaken belief that that sentence alone will preclude any possible release. Because an accurately informed jury would at least realize that the possibility of gubernatorial action cannot be avoided in any event, it is less likely to return a death sentence when it is not convinced that death is warranted. The prejudice to the defendant is manifest.[8]

The Attorney General alternatively contends that the "half-truth" of the Briggs Instruction is justifiable because the "other half" of the truth—informing the jury that a death sentence can also be commuted—would inject additional prejudice, creating the risk that the jury might be less hesitant to impose the death penalty if it realized that the Governor could exercise leniency if he concluded that the jury had made a mistake in imposing death. It is undoubtedly true—as we discuss below—that an instruction which informs the jury of the Governor's power to commute a death sentence does pose a danger of diminishing the jury's sense of responsibility, creating the risk that the jury may "pass the buck" to the Governor and not take personal responsibility for its sentencing decision. Indeed, this is the point made by

---

[8]For the same reason, the instruction cannot legitimately be defended as necessary to correct any allegedly misleading impression conveyed by the "life imprisonment without possibility of parole" terminology. If the intent were simply to eliminate any possible misimpression that the jury may have, the instruction should tell the jury that both a sentence of life without possibility of parole and a sentence of death may be commuted to a sentence which includes the possibility of parole. If "life without parole" is "misleading" in that it does not take into account the possibility of commutation, "death" is equally flawed.

the United States Supreme Court. (See p. 151, *ante.*) But the existence of that particular untoward consequence does not eliminate or obviate the separate and distinct prejudice that flows to the defendant as a result of the Briggs Instruction's "half-truth." As just noted, because of the misleading character of the instruction, a jury that believes that death is not necessarily warranted may nonetheless impose death in the mistaken belief that that is the only penalty that will avoid the possibility of a commutation. The fact that an accurate instruction may also be harmful to a defendant in some other fashion cannot excuse the serious prejudice that flows directly from the misleading nature of the instruction.

Finally, and somewhat inconsistently with the immediately preceding contention, the Attorney General argues that the incomplete nature of the Briggs Instruction is not likely to be prejudicial because jurors can be expected to know, as a matter of common knowledge, that a death sentence, as well as a sentence of life without possibility of parole, is subject to the Governor's commutation or pardon power. We doubt that the precise scope of the Governor's commutation power under the California Constitution is a matter of common knowledge.[9] But even if a juror began the proceedings under the general impression that the Governor's power applied to both sentences, we think that the wording of the Briggs Instruction is reasonably likely to lead the juror to conclude that the commutation power only applies to life without possibility of parole. The negative implication of the instruction is simply too strong to be ignored.

Accordingly, we conclude that the misleading nature of the instruction alone is enough to condemn it as an unconstitutional denial of due process.

B

Furthermore, even if the Briggs Instruction were modified so that it was totally accurate, the instruction would still violate the state constitutional due process guarantee because its reference to the commutation power invites the jury to consider matters that are both totally speculative and that should not, in any event, influence the jury's determination.

Over 20 years ago, in *People* v. *Morse* (1964) 60 Cal.2d 631, 636-653 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], we examined at length the propriety of an instruction which permitted a sentencing jury to consider a variety of potential postconviction actions by other governmental enti-

---

[9]For example, it would be surprising if the average juror knew that if a defendant in a capital case has previously been convicted of a felony, the Governor may not grant a pardon or commutation "except on recommendation of the Supreme Court, 4 judges concurring." (Cal. Const., art. V, § 8.)

ties—parole, commutation, trial court review—in determining the sentence that the defendant should receive. We concluded that any such consideration was totally improper and inconsistent with the jury's proper decisionmaking role.

*Morse*'s conclusion in this regard is supported by the overwhelming majority of decisions from our sister states.[10] These numerous decisions—which are by no means confined to the capital sentencing context—reflect a broad consensus that jury consideration of such matters is incompatible with a fair trial.

As the authorities explain, there are a variety of reasons why such consideration is improper. The first and perhaps most obvious problem is the speculative nature of the inquiry that the instruction invites. One principal difficulty, of course, lies in attempting to predict what a particular defendant is likely to be like some 10, 15, 20 or more years in the future when commutation may be considered. In *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767-775 [175 Cal.Rptr. 738, 631 P.2d 446], we reviewed the recent scientific studies demonstrating the general unreliability of attempts to forecast future violence and concluded that in general expert testimony of a defendant's alleged future dangerousness is not sufficiently reliable to be even considered at the penalty phase of a capital trial.

In the present context, moreover, the problems of prediction are of an entirely different, and greater, magnitude. Here, the jury must attempt to

---

[10]Twenty-five other jurisdictions have concluded that the jury should not consider the possibility of pardon, parole or commutation. (See, e.g., *Grady* v. *State* (Ala. Crim. App. 1980) 391 So.2d 1095, 1097-1100; *Westbrook* v. *State* (1979) 265 Ark. 736 [580 S.W.2d 702, 708]; *Sukle* v. *People* (1941) 107 Colo. 269 [111 P.2d 233, 235]; *Smith* v. *State* (Del. 1974) 317 A.2d 20, 24-26; *Paramore* v. *State* (Fla. 1969) 229 So.2d 855, 860; *Fleming* v. *State* (1977) 240 Ga. 142, 146 [240 S.E.2d 37, 40]; *People* v. *Walker* (1982) 91 Ill.2d 502, 515 [64 Ill.Dec. 531, 440 N.E.2d 83, 88-90]; *Farmer* v. *Commonwealth* (Ky. 1970) 450 S.W.2d 494, 494-495; *State* v. *Lindsey* (La. 1981) 404 So.2d 466, 484-488; *Poole* v. *State* (1983) 295 Md. 167 [453 A.2d 1218, 1232-1233]; *State* v. *Rollins* (Mo. 1970) 449 S.W.2d 585, 591; *Grandsinger* v. *State* (1955) 161 Neb. 419 [73 N.W.2d 632, 650-651]; *Serrano* v. *State* (1968) 84 Nev. 676 [447 P.2d 497, 499]; *State* v. *White* (1958) 27 N.J. 158 [142 A.2d 65, 71-77]; *State* v. *Jones* (1979) 296 N.C. 495 [251 S.E.2d 425, 427-429]; *McKee* v. *State* (Okla. Crim.App. 1978) 576 P.2d 302, 305-306; *State* v. *Leland* (1951) 190 Ore. 598 [227 P.2d 785, 796]; *Commonwealth* v. *Aljoe* (1966) 420 Pa. 198 [216 A.2d 50, 55-56, 16 A.L.R.3d 1126]; *State* v. *Atkinson* (1970) 253 S.C. 531 [172 S.E.2d 111, 112]; *Farris* v. *State* (Tenn. 1976) 535 S.W.2d 608, 612-614; *Clanton* v. *State* (Tex. Crim. App. 1975) 528 S.W.2d 250, 252-254; *Hinton* v. *Com.* (1978) 219 Va. 492 [247 S.E.2d 704, 706]; *State* v. *Todd* (1970) 78 Wn.2d 362 [474 P.2d 542, 548-551]; *State* v. *Lindsey* (1977) 160 W.Va. 284 [233 S.E.2d 734, 736-740]; *State* v. *Carroll* (1937) 52 Wyo. 29 [69 P.2d 542, 559-564].)

Only three jurisdictions have reached a contrary conclusion. (*Massa* v. *State* (1930) 37 Ohio App. 532 [9 Ohio L.Abs. 408, 175 N.E. 219, 221-222]; *State* v. *Jackson* (1966) 100 Ariz. 91 [412 P.2d 36, 40-42]; *Brewer* v. *State* (Ind. 1981) 417 N.E.2d 889, 908-909.)

determine not only what a particular defendant will be like in the future but also what some presently unknown person—a future Governor—will do in response to the defendant's then condition. As the Supreme Court of Louisiana observed: "When a jury's attention is . . . thrust into speculation about the future action of as yet unknown actors, a serious possibility arises that each death sentence imposed under such conditions is the result of an interjection of an unquantifiable factor into the deliberation process, thereby rendering the decision arbitrary. . . ." (*State* v. *Lindsey, supra,* 404 So.2d 466, 487.) Or, as the Tennessee Supreme Court put it: "This is trial 'by guess and by golly' and we will not countenance it by upholding a statute which offends every sense of fairness and every precept of due process." (*Farris* v. *State, supra,* 535 S.W.2d 608, 614.)[11]

Furthermore, the problems posed by jury consideration of the possibility of future commutation extend much deeper than the threshold problems arising from the speculativeness of the inquiry. As a number of cases point out, any instruction which draws the jury's attention to the possibility of future actions by a governor or parole board is likely to affect the jury's decisionmaking process in either of two illegitimate—though very different—ways, diverting the jury from its proper function.

The first vice of such an instruction—touched on already—is that it may tend to diminish the jury's sense of responsibility for its action. As the Supreme Court of Delaware explained: "[K]nowledge on the part of the jury that there is possible review by other governmental authorities may cause that jury to avoid its responsibility. . . . [S]uch comment may imply to a jury that if it mistakenly convicts an innocent man, or mistakenly fails to recommend mercy, the error may be corrected by others; under such circumstances, a conviction is more likely and a recommendation of mercy less likely." (*Smith* v. *State, supra,* 317 A.2d 20, 25.)

For just this reason, over a quarter of a century ago we held in *People* v. *Linden, supra,* 52 Cal.2d 1, 27, that it is improper for a prosecutor to advise the jury of the automatic appeal to this court whenever the death penalty is

---

[11]The record in another automatic appeal pending before us clearly shows how the Briggs Instruction invites just such a speculative inquiry. In *People* v. *Armendariz,* Crim. 21956, the prosecutor told the jury: "So, not knowing what the future of California holds for us politically . . . I suggest to you that life without parole really is meaningless because who's to know in ten years what might be going on in the state, who might be Governor. . . . *Who knows that perhaps a governor might be elected by the people who was willing to accept bribes for changing—for pardoning people and commuting their sentence.* You just can't count on what is going to happen in the future, what appropriately might be done. . . . [Y]ou now are in the best position to make a decision and you shouldn't leave it to someone in the future who might change that decision and reduce it substantially from what you might consider is appropriate, that is, life without parole." (Italics added.)

imposed: "[Jurors] should approach the tasks of finding facts and exercising discretion as to choice of penalty with appreciation that their duties are serious and that they are accountable for their decisions, not with the feeling that they are making mere tentative determinations which the courts can correct. The [jurors] have no concern with and should not be informed of the automatic appeal where judgment of death is imposed . . . . [¶] Argument such as that of the deputy district attorney above quoted improperly diminishes the [jurors'] recognition of their duties and responsibilities and powers." This reasoning applies equally to an instruction which directs the jury's attention to the gubernatorial commutation power.

Second, in addition to diminishing the jury's appreciation of its personal responsibility for the sentencing decision, an instruction on the possibility of commutation invites the jury to go beyond its proper role and attempt to "preempt" the Governor's constitutional authority by imposing a sentence that will at least minimize the opportunity for such a commutation. As the Supreme Court of Louisiana explained: "[P]ermitting a jury to consider the governor's possible grant of a pardon induces it to pass judgment upon the very issue entrusted only to the governor and Board of Pardons and could prevent them from deciding the issue at the proper time. [Citation.] The jury could conclude that the governor will improperly pardon dangerous offenders or commute their sentences, thereby encouraging it to pre-empt the governor's power and defeat the constitutional design by opting for the death penalty." (*State* v. *Lindsey, supra,* 404 So.2d 466, 487.)

The impropriety in suggesting to a jury that it may base its sentencing decision on such a consideration is plain. As the New Jersey Supreme Court declared in *State* v. *White, supra,* 27 N.J. 158, 177-178 [142 A.2d 65, 76]: "It is no more proper for a jury to conclude that death be the penalty because a life sentence may be commuted or the defendant paroled, than it would be for a trial judge in other criminal causes deliberately to impose an excessive sentence to frustrate the statutory scheme committing parole to another agency."

Thus, upon analysis, it becomes clear that the Briggs Instruction in reality serves no legitimate purpose. By drawing the jury's attention to the Governor's commutation power, the instruction invites the jury to second-guess a future Governor's exercise of his constitutional authority and to impose a harsher sentence than it might otherwise impose simply out of fear that the Governor and the parole authorities will make a mistake and will release the defendant while he is still dangerous. To permit a jury to act in this fashion is inconsistent with a defendant's right under the California Constitution to have the commutation decision made by the Governor and undermines the fairness of the jury's determination.

Accordingly, we conclude that the Briggs Instruction violates the due process clause of the California Constitution both because it is misleading and because it invites the jury to consider speculative and impermissible factors in reaching its decision. If this case reaches the penalty phase on remand, the instruction should not be given.[12]

## IV

For the reasons discussed in part II, the judgment is reversed insofar as it relates to the special circumstance finding and penalty. On the issue of guilt, the judgment is affirmed.

Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**LUCAS, J.**, Concurring and Dissenting.—I concur in the majority opinion insofar as it affirms the judgment of guilt. I also reluctantly concur in the reversal of the judgment insofar as it relates to the special circumstances finding and penalty, under compulsion of *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], a case which, in my view, was incorrectly decided. (See *People* v. *Whitt* (1984) 36 Cal.3d 724, 749 [205 Cal.Rptr. 810, 685 P.2d 1161] [dis. opn.].) The present case involves a coldblooded, execution-style murder, and it is inconceivable to me that the jury would have failed to find an intent to kill had it been instructed on that

---

[12]While the Briggs Instruction clearly should not be given, there is a legitimate question whether in general a trial court should instruct the jury *sua sponte* that it should not consider the possibility of commutation in reaching its decision, or whether no instruction on the subject should be given at all.

When the jury raises the commutation issue itself—either during voir dire or in a question posed to the court during deliberations—the matter obviously cannot be avoided and is probably best handled by a short statement indicating that the Governor's commutation power applies to both sentences but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence. (Cf. *People* v. *Morse, supra,* 60 Cal.2d 631, 648.)

When the issue is not expressly raised by the jury, it is a close question whether it is preferable for the court to give such a cautionary instruction on the assumption that some jurors might otherwise be aware of the possibility of commutation and improperly consider it, or whether such an instruction is simply more likely to bring the matter to the jury's attention and, as a practical matter, be difficult to follow.

A similar problem has arisen in the Fifth Amendment realm, with respect to an instruction that cautions the jury that it may not draw an adverse inference from the fact that a defendant has not testified at trial. In that context, California courts have held that while such an instruction must be given if requested by the defendant, a trial court has no duty to give the instruction *sua sponte* in light of the possibility that it would prove more prejudicial than beneficial. (See, e.g., *People* v. *Gardner* (1969) 71 Cal.2d 843, 852-854 [79 Cal.Rptr. 743, 457 P.2d 575].) A similar approach—permitting the defendant to assess the relative cost and benefit of a cautionary instruction in a particular case—appears appropriate with regard to the commutation issue.

subject. Under *Garcia's* "reversible per se" rule, however, the judgment must be reversed.

In addition, I dissent to the majority's further holding that the so-called "Briggs Instruction" is unconstitutional, a holding which seemingly will result in summarily reversing 20 to 30 other capital cases wherein similar instructions were given. I suggest that such a wasteful result is wholly unjustified in light of the harmless contents of the challenged instruction.

Nearly three years ago, a majority of this court ruled that the Briggs Instruction was invalid under the *federal* Constitution, despite Justice Richardson's admonition, in dissent, that no case had ever suggested any constitutional infirmity in informing the jurors regarding the Governor's commutation power. (*People* v. *Ramos* (1982) 30 Cal.3d 553, 602-603 [*Ramos I*].) The case was reviewed by the United States Supreme Court where, as the dissent had predicted, the majority's holding was firmly discredited. (*California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].) In the meantime, of course, this case (and dozens of other automatic appeals raising the same issue) sat in abeyance, gathering dust.

Today, the majority attempts to resurrect its prior holding by relying upon the *state* Constitution, an issue left open in *Ramos I* (see 30 Cal.3d at p. 600, fn. 24). In other words, by reason of the majority's initial refusal to confront the independent state ground issue, the parties have wasted about three years which could have been spent retrying this case and all other affected cases.

In any event, the majority now reiterates its *Ramos I* analysis to the effect that the Briggs Instruction denied the accused due process because it is "misleading" and invites the jury to "speculate" regarding future exercise of the commutation power. Both points are convincingly refuted by the high court's contrary analysis in *California* v. *Ramos, supra,* and by the dissent in *Ramos I.* Accordingly, I only briefly discuss those points here.

### 1. *Instruction Not Misleading*

The majority contends that the Briggs instruction is misleading because it fails to inform the jury that the Governor may commute a death sentence as well as a life-without-parole sentence. There are two conclusive responses to that argument: First, most jurors already know of the Governor's commutation power, a matter of common knowledge in the community. (See *Ramos I,* 30 Cal.3d at p. 604, and cases cited [dis. opn. by Richardson, J.].) Second, any instruction which attempted to emphasize the Governor's power to commute a death sentence would be declared *invalid* as tending to

minimize the jury's sense of responsibility. (See *id.,* at pp. 603-604; *California* v. *Ramos, supra,* at p. 1011 [77 L.Ed.2d at pp. 1186-1187, 103 S.Ct. at pp. 3457-3458].) As stated by the high court in rejecting this precise argument, "A jury concerned about preventing the defendant's potential return to society will not be any less inclined to vote for the death penalty upon learning that even a death sentence may not have such an effect. In fact, advising jurors that a death verdict is theoretically modifiable, and thus not 'final,' may incline them to approach their sentencing decision with less appreciation for the gravity of their choice and for the moral responsibility reposed in them as sentencers." (*Id.,* at p. 1011 [77 L.Ed.2d at p. 1187, 103 S.Ct. at p. 3458].)

### 2. *Instruction Not an Invitation to Speculate*

The majority also suggests that the Briggs Instruction invites the jury to speculate regarding an irrelevant factor, namely, the possible future exercise of the Governor's power to commute a sentence of life without parole. As the *Ramos I* dissent pointed out, "To the contrary, the instruction is purely informational, explaining to those jurors who might otherwise be misled that a sentence denominated 'life imprisonment without possibility of parole' is nonetheless subject to possible commutation by the Governor. [Citation.]" (30 Cal.3d at p. 603.)

The United States Supreme Court agreed, observing that the challenged instruction "was merely an accurate statement of a potential sentencing alternative. . . . The Briggs Instruction thus corrects a misconception and supplies the jury with accurate information for its deliberation in selecting an appropriate sentence." (463 U.S. at p. 1009 [77 L.Ed.2d at p. 1186, 103 S.Ct. at p. 3457].) As the high court explained, the instruction brings to the jury's attention "the possibility that the defendant may be returned to society," thereby *properly* inviting the jury "to assess whether the defendant is someone whose probable future behavior makes it undesirable that he be permitted to return to society." (*Id.* at p. 1003 [77 L.Ed.2d at p. 1182, 103 S.Ct. at p. 3454].)

### 3. *Conclusion*

As I have indicated, the majority now relies exclusively upon the *state* Constitution to support its invalidation of the Briggs Instruction. In my view, not only does this holding come three years too late, but it also frustrates the spirit, if not the letter, of the very Constitution on which the majority so belatedly relies. Article I, section 27, of the California Constitution, adopted in 1972 by the people of this state, was intended to reinstate the death penalty "to the extent permitted by *federal* constitutional law."

(*People* v. *Frierson* (1979) 25 Cal.3d 142, 186 [158 Cal.Rptr. 281, 599 P.2d 587], italics added; see *People* v. *Superior Court* (*Engert*) 31 Cal.3d 797, 814 [183 Cal.Rptr. 800, 647 P.2d 76] [dis. opn. by Richardson, J.].) Federal constitutional law, as interpreted by this nation's highest court, now clearly permits the jury in a death penalty case to be informed of the Governor's commutation power. (*California* v. *Ramos, supra*, 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].) Accordingly, by reason of article I, section 27, we have no authority to impose additional restrictions or procedures not required by federal law.

In my view, the Briggs Instruction is constitutional. The majority's contrary holding ignores the people's will as expressed in their own Constitution. I respectfully dissent to that holding.

Respondent's petition for a rehearing was denied December 13, 1984. Lucas, J., was of the opinion that the petition should be granted.